CHARLES F. BENNETT AND VADA BENNETT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 49688. Filed April 28, 1958.

*Charlie W. Clark, Esq.*, for the petitioners.
*J. Earl Gardner, Esq.*, for the respondent.

In the statutory notice of deficiency the Commissioner determined the following deficiencies in income tax against petitioners:

| Year | Taxpayer | Tax | Additions to tax | |
|---|---|---|---|---|
| | | | Sec. 291 | Sec. 293 (b) |
| 1944 | Charles F. Bennett | $723.70 | $180.92 | $361.85 |
| | Vada Bennett | 723.70 | 180.92 | 361.85 |
| 1945 | Charles F. Bennett | 333.07 | 83.27 | 166.53 |
| | Vada Bennett | 347.63 | 86.91 | 173.81 |
| 1946 | Charles F. Bennett | 357.13 | 89.28 | 178.57 |
| | Vada Bennett | 480.62 | 120.15 | 240.31 |
| 1947 | Charles F. Bennett | 436.48 | 109.12 | 218.24 |
| | Vada Bennett | 450.52 | 112.63 | 225.26 |
| 1948 | Charles F. and Vada Bennett | 2,866.38 | 716.59 | 1,433.19 |

By amended answer, the Commissioner claimed increased deficiencies as to the section 293 (b) additions to tax for the years 1944–1947. Those increases and the resulting total section 293 (b) additions to tax for the years 1944–1947 are as follows:

| Year | Taxpayer | Increase in sec. 293 (b) addition per amendment to answer | Total addition to tax sec. 293 (b) |
|------|----------|-----------------------------------------------------------|------------------------------------|
| 1944 | Charles F. Bennett | $181.00 | $542.85 |
|      | Vada Bennett | 181.00 | 542.85 |
| 1945 | Charles F. Bennett | 304.01 | 470.54 |
|      | Vada Bennett | 359.01 | 532.82 |
| 1946 | Charles F. Bennett | 274.00 | 452.57 |
|      | Vada Bennett | 274.00 | 514.31 |
| 1947 | Charles F. Bennett | 141.00 | 359.24 |
|      | Vada Bennett | 188.50 | 413.76 |

The section 293 (b) additions in the deficiency notice were measured by the amount of tax determined to be due after the filing of delinquent returns by petitioners. The increases in the section 293 (b) additions in the amended answer were measured by petitioners' total income tax liabilities for the years in question, without regard to the payments that accompanied the delinquent returns; they were based upon the theory that the additions for fraud in connection with petitioners' original failure to file returns must be measured by the total amount of tax due, undiminished by payments accompanying delinquent or any other subsequent returns that may have been filed. The total basic tax liability, apart from the statutory additions, was determined by the Commissioner as follows:

| | | |
|---|---|---|
| 1944 | Charles F. Bennett | $1,085.70 |
|      | Vada Bennett | 1,085.70 |
| 1945 | Charles F. Bennett | 941.07 |
|      | Vada Bennett | 1,065.63 |
| 1946 | Charles F. Bennett | 905.13 |
|      | Vada Bennett | 1,028.62 |
| 1947 | Charles F. Bennett | 718.48 |
|      | Vada Bennett | 827.52 |
| 1948 | Charles F. and Vada Bennett | 2,866.38 |

### FINDINGS OF FACT.

The stipulated facts are incorporated herein by reference as part of the findings.

Petitioners are residents of Phoenix, Arizona. Petitioner Charles F. Bennett will hereinafter be referred to as Charles and his wife, Vada Bennett, as Vada.

Charles is a butcher by trade. He was 52 years old at the time of the hearing. After leaving high school, he worked in his father's meat market or for others until 1935, when he engaged in business for himself. He had no training in bookkeeping or accounting. During

the years 1944 to 1949, inclusive, he owned and operated a retail grocery and meat business under the name of "Buster's Market" at 603 North Fifth Avenue in Phoenix. He did the marketing, but his work in the store was primarily concerned with the meat department. He usually went to the market at 6 or 6:30 in the morning and worked until about 7 p. m. He employed on the average four persons. He withdrew from the business whatever amounts were needed for living and other personal expenses. He had not filed any Federal income tax returns for any of the years 1940–1949, until 1950 when so-called delinquent returns for the years 1944–1949 were filed. Prior to 1940, he had filed an income tax return for one unspecified year in some undisclosed manner "in conjunction" with his father. Some 25 years ago he had been advised by a "Mr. Murphy," an employee of the Internal Revenue Service, that he need not file a return; however, he did not understand that advice to mean that he was not required to file a return if he made a profit.

Vada worked in the store during rush hours, which included afternoons and evenings until 7 p. m. Her duties also included making daily entries in the books, acting as cashier, counting the money, and occasionally making deposits in bank accounts. When Charles was ill, she did the marketing. During 1944, 1945, and 1946, she and Charles counted ration stamps after the close of business each day.

Petitioners had two bank accounts in the Valley Bank in Phoenix, one business and the other personal. They also had a personal account in the Bank of Douglas. When interrogated by a special agent of the Internal Revenue Service as to their bank accounts, Charles failed to tell him about the personal account at the Bank of Douglas, which the agent subsequently discovered in the course of his investigation. The deposits in these three accounts came from withdrawals from the business. Most of the time Charles made the deposits in these accounts. Charles knew that the store was "making money."

In October 1944, Charles employed R. M. Shaffstall on a part-time basis to take care of the books and accounts of the store. Shaffstall set up the books, which consisted of a modified cash journal and a ledger. He made entries in the books from records which he would get at the store periodically. He did not know who prepared these records. At the end of the years 1944, 1945, and 1946 he prepared balance sheets and profit and loss statements. The profit and loss statements showed a net profit of $1,413.56 for the 3 months ending December 31, 1944; $10,037.09 for the year 1945; and $10,707.92 for 1946. Shaffstall showed the statement for 1945 to Charles. He resigned at the end of 1946. Sometime during the year 1945 he had a discussion with Charles relative to the preparation of income tax returns, and got the impression that Charles was either going to prepare his 1944 return himself or have someone else prepare it for him.

Petitioners did not file timely income tax returns for the years 1944 to 1948, inclusive. Their failure to file such returns was called to the attention of Charles by a representative of the Bureau of Internal Revenue early in 1950. Charles then engaged the services of an attorney and an accountant. The accountant, William R. Crawford, was requested to make an audit of the books and records of Buster's Market and prepare income tax returns for the years 1944 to 1949, inclusive. The books and records furnished Crawford consisted of a cashbook, a partly completed ledger, some payroll sheets, and some inventories. He found that he could not accurately determine adjusted gross income or net taxable income for the years 1944 to 1949, inclusive, from the books and records. He asked Charles what his profit was for each year, and if he said $5,000 or some other amount, and the records did not reflect it, Crawford added "enough sales information to equal that kind of business." In this way he added between $30,000 and $50,000 which he could not support by the records given him for the years 1944 to 1949, inclusive. Since the books were inadequate, he prepared returns for petitioners on the cash basis and treated the accounts receivable balance at the end of each year as inventory.

On April 21, 1950, each of the petitioners filed separate returns on a community property basis for the years 1944 to 1947, inclusive, with the collector of internal revenue at Phoenix, Arizona. Arizona is a community property State. On April 21, 1950, petitioners also filed joint returns for the years 1948 and 1949 with the same collector. All of the returns filed by petitioners had stamped thereon the words "Prepared by Woodward & Crawford From Unaudited Information Furnished by Taxpayer."

In May 1950 Charles was requested to call at the office of the Intelligence Division of the Treasury Department to discuss the delinquent returns and failure to file timely returns. Thereafter, a number of conferences were held during the months of May to September, inclusive, between Government representatives and Charles, his attorney, and Crawford. During the conferences it was discovered that petitioners had filed no returns for the years 1940 through 1943, and that there were no books or records for those years.

On May 4, 1950, the Government representatives requisitioned the books and records of Buster's Market for the years 1944 to 1949, inclusive. The records did not include invoices, checkbooks, and other material that would permit them to make an audit to determine the accuracy of the amounts entered in the books by Shaffstall. Moreover, information received from Charles and other sources disclosed that the books and records were inadequate and incomplete. They decided to resort to the net worth plus expenditures method of determining net

income, and numerous conferences were held which were attended by them, Charles, and his attorney and accountant. Balance sheets were prepared showing assets, liabilities, and nondeductible expenditures during the period January 1, 1940, to December 31, 1949, inclusive.

On July 17, 1950, each of the petitioners filed amended separate returns on a community property basis for the years 1944 to 1947, inclusive, and on the same date petitioners filed amended joint returns for the years 1948 and 1949. These amended returns were prepared by Crawford.

The total gross income of petitioners as reflected in their returns for the years 1944 to 1948, inclusive, was as follows:

| Year | Original delinquent returns | Amended returns |
|---|---|---|
| 1944 | $8,413.59 | $17,143.34 |
| 1945 | [1] 20,418.53 | [1] 22,958.53 |
| 1946 | [1] 22,254.38 | 23,631.60 |
| 1947 | 17,097.20 | 19,749.53 |
| 1948 | [1] 16,619.49 | 24,882.31 |

In computing their adjusted gross income for 1944 and 1948, the total business deductions claimed by petitioners in their returns for these years were as follows:

| Year | Original delinquent returns | Amended returns |
|---|---|---|
| 1944 | $2,851.20 | $4,875.93 |
| 1948 | 13,846.58 | 14,593.07 |

The adjusted gross income of petitioners for the years 1944 to 1948, inclusive, as reported in their returns, was as follows:

| Year | Original delinquent returns | Amended returns |
|---|---|---|
| 1944 | $5,562.39 | $12,267.41 |
| 1945 | 7,891.53 | 10,549.53 |
| 1946 | 8,453.38 | 10,042.00 |
| 1947 | 5,546.19 | 7,955.60 |
| 1948 | 2,781.91 | 10,289.24 |

[1] The original delinquent returns for 1945, 1946, and 1948 and the amended returns for 1945 were prepared in such manner as to disclose the following gross income from the business:

| Year | Original delinquent returns | Amended returns |
|---|---|---|
| 1945 | $20,238.53 | $20,958.53 |
| 1946 | 22,074.38 | ---------- |
| 1948 | 16,394.49 | ---------- |

However, the returns also disclosed other items of income as follows: (1) The original delinquent returns for 1945 showed an item of "Rental Income" in the amount of $180 "Less Water $18". (2) The amended returns for 1945 showed two additional items of income as follows: "Interest—Ritchie Loan", $90 and "Receipts—Other Sources," $1,910. (3) The original delinquent returns for 1946 showed an item of "Rental Income" in the amount of $180 "Less Water, $18." (4) The original delinquent returns for 1948 showed an item of "House Rental" in the amount of $225 "less water furnished $9.00."

Each of the petitioners reported one-half of the income shown in the foregoing separate returns filed for the years 1944 to 1947, inclusive. The 1948 income was reported in the foregoing joint returns filed by petitioners for that year. In all of their returns the petitioners either claimed the standard deduction or used the Optional Tax Table in computing the amount of the tax liability reported. Crawford learned of the additional income reported in the amended returns from answers given by Charles to questions asked him at the conferences.

A comparative balance sheet (hereinafter referred to as the net worth statement) covering the period January 1, 1940, through December 31, 1949, was subscribed and sworn to by Charles in the presence of his attorney and Government representatives on September 28, 1950, after Charles, his attorney, and his accountant had examined and discussed with the Government representatives each of the items included in that sheet. The statement immediately preceding Charles's signature reads, in part, as follows:

I, CHARLES F. BENNETT, after being duly sworn upon oath, * * * depose and say that I have read the above schedule and that it discloses, to the best of my present ability, memory and recollection, my true net worth on the dates indicated; my living expenses for the various years; and the value of groceries used by myself and my family from the store during the various years.

The net income of petitioners for the years 1944 to 1948, inclusive, as shown in the net worth statement, is as follows:

| | |
|---|---|
| 1944 | $11, 763. 42 |
| 1945 | 10, 728. 52 |
| 1946 | 11, 867. 42 |
| 1947 | 10, 239. 01 |
| 1948 | 17, 942. 31 |

In determining the deficiencies for the years 1944 to 1947, inclusive, for which petitioners filed delinquent separate returns on a community property basis, the respondent allocated one-half of the income shown above for each year to each petitioner, and reduced the income so allocated by the standard deduction and allowable personal exemption in arriving at the net income subject to tax. In determining the deficiency for 1948, for which year a delinquent joint return was filed, the respondent reduced the income of $17,942.31 by the standard deduction and allowable personal exemptions in arriving at the net income subject to tax.

The books of Buster's Market did not show the amount of the inventory at December 31, 1948, and when the Government representatives asked for a copy of the 1948 inventory they were told by Crawford that it could not be located for that year or for 1949. The amounts shown on the net worth statement as inventory at December

31, 1948, and December 31, 1949, were $7,765.82 and $6,572, respectively. These amounts were given to the Government representatives by Crawford. Before accepting these amounts, they compared them with the amounts which had been declared as inventory for 1948 and 1949 at the assessor's office. The inventory at December 31, 1948, reported by petitioners in their original and amended returns for that year was $5,158.24.

The foregoing net worth statement correctly reflects the income of petitioners for the years in controversy.

The books and records of Buster's Market for the years 1944 to 1949, inclusive, were returned to Crawford by the Government representatives on May 19, 1954, and he delivered them to Charles.

The notice of deficiencies for the years 1944 to 1948, inclusive, was mailed by respondent to the petitioners on April 24, 1953.

Prior to the filing of the original delinquent returns by the petitioners for the years 1944 through 1948, inclusive, the failure of petitioners to file returns for each of those years was deliberate and due to fraud with intent to evade tax, and at least part of the deficiencies for each year which arose by reason of such failure was due to fraud with intent to evade tax.

The original delinquent returns filed on April 21, 1950, by petitioners for the years 1944 through 1948, inclusive, were not false and fraudulent with intent to evade tax.

Petitioners omitted from gross income for each of the years 1944 and 1948 amounts properly includible therein which were in excess of 25 per cent of the amount of gross income stated in their original delinquent returns for these years.

### OPINION.

RAUM, *Judge:* 1. *Determination of net income.* Petitioners contend that the net worth statement does not correctly reflect their net worth or their net taxable income. We have found otherwise, and have concluded that there is no merit to their objections to the net worth statement. They may be dealt with briefly.

(a) Petitioners claim that the inventory figure for December 31, 1948, is erroneous. However, it must be remembered that the net worth statement was prepared by Government agents with the cooperation of petitioners' lawyer and accountant, and that it represented the fruits of numerous and protracted conferences between them. It seems hardly likely that petitioners' attorney would have permitted Charles to swear [2] to the net worth statement if each item thereon was

---

[2] We give very little weight to the fact, in the circumstances of this case, that the attorney insisted upon modifying the language of the oath.

not believed by him and the accountant to be correct. The evidence shows that there was no inventory figure for December 31, 1948, in the books and records which petitioners' accountant Crawford turned over to the Government, and that when Government agents asked for it they were told that the inventories at the end of 1948 and 1949 could not be located. Moreover, it was Crawford who gave the agents the inventory figure of $7,765.82 at December 31, 1948, shown on the net worth statement, and the evidence further shows that before the agents accepted this figure, they checked at the local assessor's office and found an inventory figure there which, when corrected to take into account what they understood to be the local practice in valuing property, was consistent with the figure given to them by Crawford. Petitioners produced no inventory records at the trial. In these circumstances, we are satisfied that their attack upon the closing inventory figure for 1948 is wholly without substance.

(b) Petitioners object to the net worth statement because "it is prepared on an accrual basis," whereas their returns were filed on a cash basis. But the net worth method is not a system of accounting (see *Holland* v. *United States*, 348 U. S. 121, 131; *Morris Lipsitz*, 21 T. C. 917, 931, affirmed 220 F. 2d 871 (C. A. 4); *Estate of George L. Cury*, 23 T. C. 305, 332–334), and, in any event, where, as here, inventories are a factor in determining net income, the use of an accrual system of accounting is mandatory. *Herberger* v. *Commissioner*, 195 F. 2d 293, 295 (C. A. 9), certiorari denied 344 U. S. 820; *Blaine Johnson*, 25 T. C. 123, 130, affirmed 233 F. 2d 952, 956 (C. A. 4); Treasury Regs. 111, sec. 29.41–2.

(c) Petitioners' attack upon the net worth statement as failing to reflect the "net taxable income" because personal exemptions or deductions are not shown is without merit. In the first place, the notice of deficiency shows that the Commissioner allowed not only personal exemptions (cf. *Henry B. Mikelberg*, 23 T. C. 342, 353, fn. 2, affirmed 234 F. 2d 34 (C. A. 3)), but also the standard deduction in determining petitioners' tax liabilities. And in the second place, to the extent that the deductions are concerned, all deductible expenditures are in any event automatically taken into account in computing the increases in net worth.[3]

(d) The petitioners have stipulated that the net worth statement correctly reflects their net worth, with the exception of "inventories, accounts receivable, groceries used from store, the membership in Associated Grocers, and the amounts included for the acquisition

[3] See *Michael Potson*, 22 T. C. 912, 927, fn. 1, affirmed sub nom. *Bodoglau* v. *Commissioner*, 230 F. 2d 336 (C. A. 7). It is therefore questionable whether the Commissioner was required to give petitioners the benefit of the standard deduction (cf. *Estate of George L. Cury*, 23 T. C. 305, 332, fn. 4), but this is a matter about which petitioners can hardly complain.

costs of certain cattle and gifts to son." This stipulation disposes of petitioners' present contentions with respect to certain other items—cash in banks, cost of personal autos, and furniture for home—which they now appear to contest.

As to the "inventories" item, petitioners contest only the inventory figure as of December 31, 1948, and we have already dealt with that aspect of the case above. As to the remaining controverted items, we were not presented with any convincing evidence that the figures shown on the net worth statement were incorrect. To the contrary, the evidence disclosing the manner in which the net worth statement was prepared and Charles' swearing thereto, upon advice of counsel, after having had the benefit of review of each item by his accountant and attorney, gives strong support to the conclusion that these items were correctly recorded on the net worth statement.

2. *Additions to tax for fraud.* Petitioners originally filed no returns whatever for the taxable years, 1944–1948. We are satisfied on the evidence that their failure to file was deliberate and fraudulent with intent to evade tax, and have so found as a fact. The evidence of fraud was strong. Charles knew that the business was profitable. He was shown a profit and loss statement, at least as to 1 year by his accountant, disclosing a substantial amount of taxable income. When asked about bank accounts by a Government agent he withheld information about a personal account at the Bank of Douglas. His explanation for failure to produce his records at the trial was far from satisfactory. We had opportunity to observe him as a witness at the trial, and are satisfied that he was not the naïve person that he is portrayed by his counsel. As to Vada, we are satisfied that she was not the innocent housewife, but was an active (although part-time) participant in the operation of the market which was their community property. She worked as cashier and banked the receipts of the enterprise. We think, on the evidence, that she was fully aware of the condition of the business, and deliberately, along with her husband, failed to file returns with intent to evade tax.

If petitioners had not thereafter filed the so-called delinquent and amended returns, there could be no question that the 50 per cent additions for fraud pursuant to section 293 (b) of the 1939 Code would properly be measured by the entire amount of tax originally due. Cf. *Fred N. Acker*, 26 T. C. 107; *A. Raymond Jones*, 25 T. C. 1100; *Arthur M. Slavin*, 43 B. T. A. 1100, affirmed 129 F. 2d 325 (C. A. 8); *Ollie V. Kessler*, 39 B. T. A. 646; *Pincus Brecher*, 27 B. T. A. 1108. May such additions for fraud be erased or diminished merely because the taxpayers filed so-called delinquent returns, long after the due dates of

the returns for the years involved, and long after their liability for taxes and additions for fraud had accrued? We think the answer must be in the negative.

Certainly, if instead of fraudulently failing to file returns petitioners had in the first instance filed timely but false returns, the additions for fraud would persist notwithstanding the later filing of amended nonfraudulent returns. Such has been firmly established. *George M. Still, Inc.*, 19 T. C. 1072, affirmed 218 F. 2d 639 (C. A. 2); *Herbert Eck*, 16 T. C. 511, affirmed 202 F. 2d 750 (C. A. 2), certiorari denied 346 U. S. 822; *Harry Sherin*, 13 T. C. 221; *Aaron Hirschman*, 12 T. C. 1223; *Maitland A. Wilson*, 7 T. C. 395; *Thomas J. McLaughlin*, 29 B. T. A. 247. Cf. *P. C. Petterson*, 19 T. C. 486; *Nick* v. *Dunlap*, 185 F. 2d 674 (C. A. 5). In *George M. Still, Inc., supra*, we said (19 T. C. at 1077):

Any other result would make sport of the so-called fraud penalty. A taxpayer who had filed a fraudulent return would merely take his chances that the fraud would not be investigated or discovered, and then, if an investigation were made, would simply pay the tax which he owed anyhow and thereby nullify the fraud penalty. We think Congress has provided no such magic formula to avoid the civil consequences of fraud. * * *

The same reasoning is equally applicable where the fraud is associated with a deliberate failure to file a return in the first instance. And the record in this case strongly suggests, if it does not in fact establish, that the so-called delinquent returns were filed by petitioners only after they had reason to believe that the Treasury was about to investigate their affairs. Surely, Congress did not intend to provide the "magic formula" to avoid the civil consequences of fraud where no return at all had originally been filed while at the same time withholding it from those who had originally filed a false return. We think a fair and reasonable construction of the revenue laws requires that both situations be treated alike.

3. *Statute of limitations.* We must next determine whether the statute of limitations operates as a bar in petitioners' favor. Section 275 (a) provides that the income taxes must be assessed within 3 years after the return was filed, but, pursuant to section 276 (a), in the case of a false or fraudulent return or of a failure to file a return, the tax may be assessed at any time. Accordingly, if petitioners had not filed their so-called delinquent returns, there would be no bar whatever. But we are of the opinion that the filing of such returns—provided that they were not false or fraudulent—would be sufficient to start the running of the period of limitations, notwithstanding that they could not operate to wipe out the so-called fraud penalty which had already accrued. For, once a nonfraudulent return is filed, putting the Commissioner on notice of a taxpayer's receipts and deductions, there can

be no policy in favor of permitting assessment thereafter at any time without limitation. We think that the statute of limitations begins to run with the filing of such returns. Cf. *J. P. Bell Co.*, 3 B. T. A. 254, 255; *Paul Haberland*, 25 B. T. A. 1370, 1376–1377; *Helvering* v. *Campbell*, 139 F. 2d 865, 868 (C. A. 4). Accordingly, unless the delinquent returns were themselves fraudulent, the period of limitations began to run on April 21, 1950, when they were filed, and the Commissioner's deficiency notice of April 24, 1953, was untimely unless there was an omission of more than 25 per cent of gross income in the returns pursuant to section 275 (c).

(a) As to fraud in connection with the delinquent returns, we are satisfied that petitioners were making a bona fide effort to report their income. Their original failure to file had been discovered, and they were obviously fearful of the possible consequences. They had engaged the services of an accountant, who was plainly making a genuine effort to piece together petitioners' income and deductions during the years in question, and they were cooperating with him. The burden of proof was on the Government in respect of fraud, and, unlike the evidence with respect to the original failure to file returns, we think the evidence in respect of the so-called delinquent returns does not convincingly show that they were false or fraudulent with intent to evade tax. We must conclude therefore that the deficiency notice was untimely, except as to any year in which more than 25 per cent of gross income was omitted from the returns.

(b) The Government contends, and we agree, that there was an omission of more than 25 per cent of gross income for the years 1944 and 1948. Such is plainly established by simple arithmetic based upon our findings.[4] Accordingly, the 5-year period provided in

---

[4] The petitioners filed their separate original returns for 1944 on a community property basis reporting thereon total gross profit of $8,413.59. This figure represents total sales less cost of goods sold, plus income from other sources, and is therefore gross income. Twenty-five per cent of this amount is $2,103.39, or $1,051.69 as to each petitioner. In their amended returns for 1944, which the petitioners urge this Court to accept as correct, they reported total gross income of $17,143.34, or $8,571.67 each. By their own admission, therefore, petitioners omitted from gross income $8,729.75, or $4,364.87 each, an amount in excess of 25 per cent of the amount of gross income stated in their original returns.

The original joint income tax return filed by petitioners for 1948 indicates a gross profit from Buster's Market of $16,394.49 and rental income of $225, or a total gross income of $16,619.49. Twenty-five per cent of this amount is $4,154.87. In their amended return for 1948, which they urge this Court to accept as correct, they reported gross income from various sources in the total amount of $24,882.31. By their own admission, therefore, they failed to report gross income of at least $8,262.82, or an amount greatly in excess of 25 per cent of the gross income stated in their original return.

The omission of gross income in excess of 25 per cent of that stated in the original returns for 1944 and 1948 is also disclosed when the net income for those years shown in the net worth statement is compared with the adjusted gross income reported in the original returns. Net income is defined in section 21 of the 1939 Code as meaning "gross income computed in section 22, less the deductions allowed by section 23." An understatement of income in a return, therefore, may result either from an overstatement of deductions or from an omission of gross income, or both. But, by claiming increased

section 275 (c) is applicable to the years 1944 and 1948, and since the deficiency notice was sent out within the 5-year period, it was timely as to those years. The filing of the "amended" returns on July 17, 1950, could not retroactively convert the 5-year period beginning on April 21, 1950, to a 3-year period. *Ira Goldring*, 20 T. C. 79.

---

In conclusion, we hold that the deficiencies as to the years 1945, 1946, and 1947 are barred, but that the years 1944 and 1948 are open. The deficiencies in tax and the section 293 (b) additions for fraud as to those years, as determined in the amended answer, are approved. There has been no showing that the section 291 additions to tax are erroneous, and they are therefore likewise approved for the years 1944 and 1948. The decision to be entered will not, of course, reflect any payments made by the petitioners in connection with their amended returns, but such decision will be without prejudice to petitioners' obtaining proper credit therefor administratively.

> *Decision will be entered for the respondent with respect to the years 1944 and 1948 and for the petitioners with respect to the years 1945, 1946, and 1947.*

---

deductions in their amended returns over those claimed in their original returns the petitioners have indicated that the understatements of net income in their original returns were not due to an overstatement of deductions. Accordingly, since there was no overstatement of deductions in the original returns, the omitted income for each year was attributable to understated gross income, and that understatement for each year was in excess of 25 per cent.