JOSEPH SOLOMON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Solomon v. Commissioner
Docket No. 5284-78.
United States Tax Court
T.C. Memo 1982-603; 1982 Tax Ct. Memo LEXIS 141; 44 T.C.M. (CCH) 1410; T.C.M. (RIA) 82603; October 18, 1982. *141 Petitioner served as accountant for Ohio Farmers and B & T Tool during the years in issue. Over that period of time, he wrongfully appropriated funds of these two corporations for his personal use. Held, the amounts appropriated by petitioner during 1969 through 1972 constitute income to him for those years. Held further, petitioner is liable for the addition to tax for fraud pursuant to section 6653(b), I.R.C. 1954, for each of the years in question. Irving Bell, for the petitioner, David D. Dahl, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, *142 Judge: By notice of deficiency dated March 1, 1978, respondent determined deficiencies in and additions to petitioner's Federal income taxes for the taxable years 1969 through 1972 as follows: Taxable year
Addition to tax pursuant to
ended Dec. 31,
Deficiency
sec. 6653(b)
sec. 6654
1969
$10,709.23
$ 5,354.62
$ 342.69
1970
9,988.05
4,994.03
319.62
1971
12,191.42
6,095.71
390.12
1972
17,713.30
8,856.65
566.83
$50.602.00
$25,301.01
$1,619.26
After concessions, the issues remaining for our consideration are: (1) whether funds appropriated by petitioner from his clients during the period 1969 through 1972 constitute income for the respective taxable years; and (2) whether petitioner is liable for the addition to tax for fraud pursuant to section 6653(b), I.R.C. 1954, for each of the taxable years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Pepper Pike, Ohio at the *143 time of filing the petition herein. He did not file Federal income tax returns for the taxable years 1969 through 1972 with the Internal Revenue Service. Petitioner graduated from Ohio State University in 1958 with a degree in accounting. After his graduation, he was employed as an auditor by the Sales Tax Department of the State of Ohio. Petitioner obtained his certified public accountant's license in 1966. During the years in question, petitioner operated Tallmadge Bookkeeping in Tallmadge, Ohio and was engaged in the business of rendering accounting, bookkeeping, tax preparation and other related services as a certified public accountant. During these years, petitioner served as accountant for Ohio Farmers Wholesale Dealer, Inc. (hereinafter Ohio Farmers) and as such was responsible for preparing and maintaining hournals and ledgers, preparing reports, preparing tax returns, and tendering tax payments on behalf of Ohio Farmers. Similarly, petitioner served as accountant for B & T Tool & Die Co., Inc. (hereinafter B & T), performing the same duties he performed for Ohio Farmers. [1]
*144 During each of the taxable years in issue, petitioner derived unreported income as a self-employed certified public accountant. In addition, he appropriated funds from Ohio Farmers and B & T during these years for his personal use. [2]
As part of his duties with respect to Ohio Farmers and B & T, petitioner computed the amounts due the Internal Revenue Service in satisfaction of the Federal withholding tax liabilities of the two corporations and presented these totals to Mr. Bernard Gelb, president and owner of Ohio Farmers, and to Mr. Ray Torok, president of B & T. Petitioner himself prepared some of the checks drawn on the corporate accounts and, in such case, he made them payable to either the Cleveland Trust Company or the Western Reserve Bank, where he had personal checking accounts. Petitioner then submitted the checks to Mr. Gelb or Mr. Torok, who signed them under the *145 belief that they were to be applied against their respective corporation's tax liabilities. After obtaining the authorized signature, petitioner endorsed each check and deposited it in his personal checking account at either the Cleveland Trust Company or the Western Reserve Bank. The checks generally were in amounts ranging from $1,200 to $1,500. Petitioner appeared at the business office of B & T every month on or near the day that B & T received its monthly bank statement and cancelled checks. He would then take possession of the statement and checks and return with them to his office where he kept them. Mr. Torok rarely had occasion to examine the checks. [3] Similarly, when its monthly statement and cancelled checks were received by Ohio Farmers, they were placed in a drawer for petitioner, who came by and picked them up each month. The amounts appropriated by petitioner from Ohio Farmers and B & T during the years in question were as follows: Year
Ohio Farmers
B & T
1969
$ 8,335.00
$17,393.44
1970
10,050.00
16,850.00
1971
13,500.00
20,700.00
1972
16,950.00
29,050.00
$48,835.00
$83,993.44
*146 Mr. Gelb discovered that petitioner had been appropriating funds from Ohio Farmers only after examining copies of the corporation's cancelled checks that were diverted by petitioner and which were shown to him by respondent's agent at an unspecified date in 1973. During the period 1969 through 1972 Mr. Gelb was not aware that petitioner was diverting the Ohio Farmers' checks. He did not intend any of the checks given to petitioner for the payment of the payroll tax liabilities of his corporation to constitute loans to petitioner. After being informed of the defalcation, Mr. Gelb attempted to contact petitioner but was unable to reach him. He finally went to petitioner's office to retrieve his records but found nothing with the exception of a 1-month bank statement. Thereafter Mr. Gelb filed a civil action against petitioner for the recovery of funds appropriated from Ohio Farmers and obtained a judgment against petitioner pursuant to that action in the amount of $43,650. Sometime in the fall of 1973, Mr. Torok terminated his relationship with petitioner due to the numerous Internal Revenue Service penalty notices he had received stating that the tax liabilities of B & T *147 had not been timely paid. Mr. Torok discovered that petitioner had been appropriating funds from B & T only after conferring with respondent's agent and examining copies of cancelled checks, reflecting diversions by petitioner, sometime in the fall of 1973. During the period 1969 through 1972 Mr. Torok did not know that petitioner was appropriating the proceeds of the B & T checks. It follows that Mr. Torok did not intend any of the checks given to petitioner for the payment of payroll tax liabilities to constitute loans to petitioner. Petitioner failed to return the records of B & T maintained by him despite repeated requests by Mr. Torok for their return. When Mr. Torok finally went to petitioner's office to retrieve the records, he could find only four or five cancelled checks covering the 8- to 9-year period petitioner served as B & T's accountant. As of 1973 B & T was liable for unpaid employment taxes of approximately $60,000. Mr. Torok filed a civil action against petitiner to recover the funds petitioner appropriated from B & T and obtained a judgment against petitioner pursuant to that action in the amount of $67,550. In October of 1973 petitioner met with respondent's *148 agent and informed him that the only checking account maintained by him was at the Cleveland Trust Company. He failed to disclose the existence of the checking account maintained at the Western Reserve Bank, which was closed out in March of 1971. During the interview petitioner indicated to respondent's agent that he would produce his records for the years 1969 through 1972. This he failed to do, allegedly at the advice of his attorney. Petitioner abandoned his accounting practice and vanished from the Cleveland area subsequent to his interview with respondent's agent in October of 1973. Thereafter, a four-count information was filed charging petitioner with violations of section 7203, willful failure to file Federal income tax returns for the taxable years 1969 through 1972. Petitiner pled guilty to willful failure to file a Federal income tax return for the year 1972 on June 16, 1975. Petitioner also failed to file state income tax returns for the years 1969 through 1972. He did, however, file city income tax returns for 1969 through 1971 showing net income from his accounting practice of $7,005 in 1969, $6,600 in 1970, and $6,050.47 in 1971. Petitoner filed Federal *149 income tax returns for the taxable years 1966, 1967 and 1968 reflecting tax liabilities for each of those years. He was aware of the fact that he had earned sufficient income in each of the years in question to require him to file income tax returns for such years. [4] Petitioner also knew that he could have filed income tax returns for the years 1969 through 1972 without remitting the amount shown as the balance due on the returns. He also was aware that he could have applied for extensions of time within which to file his income tax returns for each of the years in question. Petitioner agrees that respondent's determination of his tax liabilities for the years 1969 through 1972 (excluding any statutory additions to tax based on fraud), as set forth in the notice of deficiency, s correct unless it is found that petitioner received nontaxable funds during this period from Bernard Gelb and Ray Torok. OPINION The first issue for decision is whether the funds appropriated by petitioner from two of his clients during the period 1969 through 1972 constitute *150 income for those years. The amounts appropriated by petitioner from Ohio Farmers and from B & T during the 4 years in question are no longer in dispute. Therefore, we need only address their includability in petitioner's income. Petitioner bases his entire argument on the contention that the monies appropriated by him from his two clients were in the nature of loans and therefore not includable in income. He stated at trial that he kept a running total of the amounts diverted from his clients and fully intended to repay such amounts as soon as his financial circumstances allowed him to do so. Respondent, on the other hand, asserts that petitioner never intended to repay the misappropriated funds and that therefore such funds must be included in petitioner's income. It is well settled that money obtained by means of embezzlement constitutes income to the perpetrator. James v. United States,366 U.S. 213 (1961); Bailey v. Commissioner,420 F.2d 777, 778 (5th Cir. 1969), affg. 52 T.C. 115 (1969); Fox v. Commissioner,61 T.C. 704, 713 (1974); *151 Nerem v. Commissioner,41 T.C. 338, 341 (1963). Contrary to petitioner's contention, there is no requirement that there be a prior judicial determination that an embezzlement has occurred; such determination is within the compass of the Court. [5] Moreover, whether petitioner embezzled the funds or simply misappropriated them would not change the taxable nature of the "transactions" under the reasoning of James v. United States,supra.
Petitioner argues that, over the entire course of his scheme of diverting the proceeds from the checks of his clients into his personal checking accounts for his own use, he considered the funds obtained to be loans from his clients which he intended to repay at some future time. As support for this, petitioner alleges that Mr. Gelb was aware of his practice of appropriating checks ostensibly designated for payment of payroll taxes and that Mr. Gelb tacitly approved this conduct. A substantial difficulty with this contention is that Mr. Gelb testified that *152 he was completely unaware of petitioner's activities during the 4-year period in question and that by no means did he give tacit, or any other form of, approval to such conduct. Likewise, Mr. Torok stated that he was ignorant of petitioner's appropriations. Thus, the purported loans were, to put it mildly, unilateral in origin. The appropriations by petitioner constitute taxable income to him, for the mere labeling of such nonconsensual appropriations by petitioner as "loans" does not alter their underlying character. As the Fifth Circuit stated in Moore v. United States,412 F.2d 974, 979-980 (5th Cir. 1969): The reasoning of James is that while an embezzler has a legal obligation to repay and may intend to repay, his legal obligation and intent are not the same as an actual agreement between lendor and borrower entailing "consensual recognition" of an obligation to repay and exact conditions of repayment. * * * The absence of a consensual agreement between the party providing the money and the party receiving it is fatal to the Trustee's contention that the money should be excluded from gross income on a loan theory. Therefore, it must be treated as *153 income. Similarly, in the instant case, even if we accept petitioner's self-serving testimony that he considered himself nothing more than a debtor with respect to the diverted funds, the absence of a consensual agreement between petitioner and his "lenders" to this effect precludes us from holding that the appropriated funds do not constitute income to petitioner. Furthermore, even if an intent on the part of petitioner to repay misappropriated funds has the effect of causing exclusion from income, which under James v. United States,supra, it does not, we do not believe that petitioner had such an intent. His statements in this connection we find to be utterly incredible. We believe that petitioner appropriated the determined amounts from both his clients with absolutely no intention of ever repaying such amounts. The amounts embezzled over the 4-year period totaled over $130,000. Petitioner failed to explain how he intended to repay this large sum in light of the fact that the income he received as an accountant during the surrounding period was not substantial. Petitioner's stated intention to repay the amounts appropriated is belied by his *154 failure to retain or otherwise make available the records of his two clients that he kept in his Tallmadge office. These records mysteriously disappeared at the same time as did petitioner. Furthermore, petitioner's actions, after he came under investigation by the Internal Revenue Service for failure to file, indicate a real measure of guilt. Petitioner disappeared from the Cleveland area as soon as he discovered that he was in trouble. He did not contact either of the parties from whom he allegedly borrowed money to assure them that the funds would be repaid. He simply disappeared. In fact, petitioner never volunteered to repay the funds, and it was necessary for both Mr. Gelb and Mr. Torok to bring civil actions against him to recover the amounts appropriated. Petitioner is no longer in a position where he wants the cheese. He just wants out of the mousetrap. In this hope, he must be frustrated. Respondent's determinations with respect to the deficiencies are sustained. [6]
*155 The second issue in this case is whether petitioner is liable for the addition to tax for fraud pursuant to section 6653(b) for each of the years in question. The existence of fraud is an issue of fact to be determined from a consideration of the entire record. Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent bears the burden of proving fraud and must affirmatively establish its existence by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Beaver v. Commissioner,55 T.C. 85, 92 (1970); Imburgia v. Commissioner,22 T.C. 1002, 1014 (1954). If any part of an underpayment of tax is due to fraud with an intent to evade tax, then respondent's section 6653(b) claim must be sustained. [7]When fraud is asserted for more than one taxable year, respondent must show that some part of the underpayment was due to fraud for each taxable year in issue for the corresponding addition for *156 fraud for each such year to be upheld. Otsuki v. Commissioner,53 T.C. 96, 105 (1969). However, respondent is not required to prove the precise amount of the underpayment resulting from fraud. Otsuki v. Commissioner,supra at 105. In order to prove fraud, respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968); Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). According to Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950), as quoted in Olinger v. Commissioner,234 F.2d 823 (5th Cir. 1956), "fraud implies bad faith, intentional wrongdoing and a sinister motive. It is never imputed or presumed and the courts should not sustain findings of fraud upon circumstances which at the most create only suspicion." 234 F.2d at 824. However, since fraud rarely *157 can be established by direct proof, fraudulent intent may be proven circumstantially from the conduct of the taxpayer and all other evidence of record. Stone v. Commissioner,56 T.C. 213, 224 (1971). In our case, petitiner's income was understated by reason of the fact that he failed to file income tax returns for the years in question. It s well settled that a fraudulent understatement of income can be accomplished by means of a failure to file. Stoltzfus v. United States,supra at 1005; Beaver v. Commissioner, supra at 92-93. Such a willful attempt to evade tax may be found from any conduct calculated to mislead or conceal. Powell v. Granquist,252 F.2d 56, 61 (9th Cir. 1958); *158 Gemma v. Commissioner,46 T.C. 821, 834 (1966). Bearing in mind the above-stated principles, we find inescapable the conclusion that petitoner's failure to file income tax returns for each of the years in question was due to fraud. As a certified public accountant, petitioner was well aware that he had sufficient income during the taxable years at issue, even disregarding the appropriated money, to require the filing of tax returns. Moreover, because we are of the strong belief that petitioner had no intention of ever repaying the amounts appropriated, he therefore was aware that these amounts constituted income that should have been reported. Not coincidentally, the 4 years that petitioner failed to file were the same 4 years that he was siphoning funds away from unsuspecting clients for his own benefit. Petitioner absconded with the records of his clients shortly after his encounter with respondent's agent. Concealment, destruction and alteration of records are clear "badges" of fraud. See Powell v. Granquist,supra at 59. Additionally, petitioner *159 failed to inform respondent's agent of the existence of his account at the Western Reserve Bank, an account into which he deposited a portion of the wrongfully appropriated funds prior to closing it out in March 1971. Petitioner's concealment of this income repository is also indicative of fraud. Petitioner stated that he filed city income tax returns for the years in question because he knew that his failure to do so would be discovered. These statements reflect negatively upon petitioner's claim that his failure to file Federal income tax returns was in good faith. Where a taxpayer knowingly refuses to make a statement of his income over a course of years, this fact is persuasive evidence, in connection with other facts, of an intent to defraud. Powell v. Granquist,supra at 60-61; Gemma v. Commissioner,supra at 834; Bennett v. Commissioner,30 T.C. 114, 122 (1958). Finally, we have considered the evidence in view of the fact that petitioner is a certified public accountant. Such experience is relevant since, in determining the presence or absence of fraud, the trier of fact "must consider the native equipment *160 and the training and experience of the party charged." Iley v. Commissioner,19 T.C. 631, 635 (1952). See also Beaver v. Commissioner,supra at 93, where the taxpayer's profession as a CPA was considered by this Court in finding that the taxpayer's failure to file over a number of years was due to fraud with an intent to evade tax. Based on the foregoing and on the record as a whole, we find that respondent has determined by clear and convincing evidence that petitioner's failure to file Federal income tax returns for each of the years in question was deliberate and motivated by a fraudulent intent to evade tax. Accordingly, Decision will be entered for the respondent.
Footnotes
1. Mr. Bernard Gelb, the owner and president of Ohio Farmers, was related to petitiner by reason of his marriage to petitioner's first cousin sometime in the early 1950's.↩
2. Petitioner stated that he used the monies appropriated primarily to pay household and medical expenses and to repay loans. Petitioner was the obligor on two mortgages on a house he purchased in 1968 for $55,000. Additionally, petitioner purchased a new car during each of the years in question.↩
3. Mr. Torok did not keep journals or ledgers of B & T's business; neither did he keep a checking account reconciliation. These apparently were petitioner's responsibilities.↩
4. For what it is worth, petitioner indicated on a loan application dated May 23, 1972 that his monthly income was $2,500.↩
5. See, for example, Beaton v. Commissioner,T.C. Memo. 1980-413; Nuckols v. Commissioner,T.C. Memo. 1970-308↩.
6. We note that embezzled or misappropriated funds that have been included in income by the perpetrator are deductible in the year that they are paid back. James v. United States,366 U.S. 213, 220 (1961); Fox v. Commissioner,61 T.C. 704, 713↩ (1974).
7. Sec. 6653(b) provides, in pertinent part, as follows: SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.↩