RALPH K. SWAFFORD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent. BEATRICE SWAFFORD, Petitioner v. COMMISSIONER OF INTERNAL revenue, Respondent.
Swafford v. Commissioner
Docket Nos. 5446-68, 5447-68.
United States Tax Court
T.C. Memo 1973-122; 1973 Tax Ct. Memo LEXIS 165; 32 T.C.M. (CCH) 528; T.C.M. (RIA) 73122; June 6, 1973, Filed Towner Leeper, for the petitioners. *166 Ralph V. Bradbury, Jr., and J. Michael Brown, for the respondent. TANNENWALD
MEMORADUM FINDINGS OF FACT AND OPINION TANNEDWALD, Judge: Respondent determined the following deficiencies in petitioners' income tax and additions to the tax as follows: 2 Docket No. 5446-68 - Ralph K. Swafford Additions to tax Year
Income tax
Sec. 6653(b) [1]
Sec. 6654
1961
$867.00
$433.50
$18.22
1962
5,053.05
2,526.52
135.17
1963
1,426.58
713.29
32.69
1964
1,931.18 965.59
46.82
1965
18,302.15
9,151.07
505.20
1966
7,257.77
3,628.88
191.85
1967
122,507.14
61,253.57
3,920.23
Docket No. 5447-68 - Beatrice Swafford Additions to tax Year
Income tax
Sec. 6651 (a)
Sec. 6653 (a)
Sec. 6654 1961
$783.00
$195.75
$39.15
$21.93
1962
4,827.45
1,206.86
241.37
135.17
1963
1,323.38
330.85
66.17
37.05
1964
1,844.87
461.22 92.24
51.65
1965
18,390.95
4,597.74
919.55
514.95
1966
7,144.45
1,786.11
357.22
200.04
1967
122,504.74
18,375.71
6,125.24
3,920.15
*167 Respondent has conceded that no deficiencies exist for 1961 and 1964. [2] The questions remaining for our consideration involve a determination of petitioners' taxable income for 3 the years in issue from the importation of silver coins and mercury from Mexico and the sale of these elements to United States and Canadian purchasers. We are also asked to determine whether any part of the several additions to tax determined by respondent is proper. Some of the facts herein have been stipulated. The stipulations of fact with accompanying exhibits are incorporated herein by this reference. The petitioners herein are husband and wife, who resided in El Paso, Texas, at the time the petitions herein were filed. Any reference hereinafter to "Petitioner" shall be deemed to refer to Ralph K. Swafford. Petitioners did not file any tax returns or estimated tax returns for the years in question, nor did they pay any taxes at all during those years. Consequently, all of the years are open *168 as to both petitioners under the provisions of section 6501(c) (3). From the latter part of 1961 through 1967, petitioner was in the business of importing silver coins and mercury into the United States from Mexico. We believe that an orderly disposition of these cases can best be achieved by dealing on a year-by-year basis with the basic deficiency determined by respondent 4 and thereafter with the various additions to tax which have been determined against each petitioner. Before we proceed in this fashion, however, some observations are in order. The trial consumed almost five full days and produced over 1,000 pages of testimony and several hundred exhibits. The taking of the testimony and the admission of the exhibits presented substantial difficulties due in large part to the failure of the petitioner to keep records of his business transactions and to the problems encountered by counsel in obtaining other necessary documentation, some of which were unavoidable but many of which could have been avoided in the pretrial process. The briefs - at least petitioner's brief - [3] ameliorated the situation to a degree, but they failed to present the critical analysis and *169 counter-analysis of the underlying facts which the record herein demanded. The Court has not relished the burden thus thrust upon it. It has nevertheless assumed that burden and its findings and conclusion reflect an extensive and careful analysis of the entire record, taking into account the degree of credibility which it accorded the various 5 witnesses. In this connection, we note that the record is replete with "skulduggery" and we are convinced that the petitioner was involved therein, or at least had knowledge thereof, to a substantial degree and was not simply an innocent, unknowing victim of circumstances. At the trial, there were many issues raised relating to the admissibility of various evidentiary materials. The Court reserved to both parties the opportunity to reargue their respective objections to its rulings on these issues, but they have not seen fit to do so and we, consequently, consider any such objections abandoned. In some cases, evidentiary material was admitted for limited purposes and we have carefully observed those limitations *170 in arriving at our findings and conclusions herein. Also at the trial, there were questions of the location of the burden of proof as to particular items, especially with reference to the attribution of certain sales of mercury and silver coins to petitioner and the measure of the profit on such sales, as well as other sales for petitioner's account and sales by certain partnerships of which petitioner was allegedly or concededly a member.[4] 6 These questions and the Court's disposition of them become totally irrelevant in view of the fact that we have reached our findings and conclusions herein affirmatively on the basis of the record as a whole rather than on the basis of any failure to sustain the burden of proof, keeping in mind that such burden is on the petitioners as to certain of the additions to tax and on respondent to prove fraud by clear and convincing evidence under section 7454(a) (see e.g., Estate of Ernest Clarke, 54 T.C. 1149, 1162 (1970); Luerana Pigman, 31 T.C. 356 (1958)). In this connection, we note that we are entitled to take into account with respect to an issue, as to which one party has the burden of proof, evidence submitted *171 on behalf of the other party. Nathaniel M. Stone, 56 T.C. 213, 224 (1971). In the context of the foregoing, we have made the determination for each of the years at issue, as revealed by our findings, including those in respect of the existence of various partnerships, petitioner's distributive share of the profits thereof, the sales of silver coins and mercury by such partnership and by petitioner for his own account, and the profit realized on such sales. A schedule of the sales involved is 7 attached hereto and made a part hereof as an Appendix. As regards the profit element, we think that the evidence before us amply demonstrates that in each of the taxable years in question the profit margins were not less than 28 percent and 6.67 percent of sales for silver coins and mercury, respectively. We say "not less than" because we recognize the potential for doubt arising from the use of a constant figure for profit margin over a period of several years, i.e., 1962 through 1967 in *172 the case of silver coins and 1965 through 1967 in the case of mercury. The minimum percentage indicated is predicated in the case of silver coins upon stipulated portions of court proceedings in El Paso in 1963. The information from those proceedings finds support in other credible evidence in the record before us, including, but not limited to, a judgment of a California court which fixed petitioner's share of the income of certain arrangements which we have found to be partnerships. With respect to mercury, the minimum percentage is likewise derived from stipulated information regarding a confiscation by Mexican authorities in 1965 and is supported by other credible evidence, including, but not limited to, transactions by the Elhart partnership in 1966 and 1967 8 (see pp. 17-18, infra ) which indicate that the profit margin was higher. Under all the circumstances, we are convinced that 28 percent and 6.67 percent are the proper measure of profit margins and we have applied these percentages to the sales of silver coins and mercury involved herein. Cf. Estate of Mazzoni v. Commissioner, 451 F. 2d 197 (C.A. 3, 1971), affirming a Memorandum Opinion of this Court *173 ( Peter Mazzoni, T.C. Memo. 1970-37). Against the foregoing background, we turn to a sequential consideration of the basic deficiencies. 1961 Respondent concedes that there are no deficiencies or additions to tax against either of the petitioners for this taxable year. 1962 Sometime in early 1962, petitioner entered into arrangements with Jack Thompson (hereinafter referred to as Thompson) and several other persons, whereby they agreed to import Mexican silver coins for sale to United States refiners of precious metals. Petitioners had a 20-percent share in the profits and losses. These arrangements constituted a partnership. Between January 22, 1962 and March 30, 1962, the partnership made sales of 9 silver coins totalling $134,805.01. On May 9, 1962, petitioner made an additional sale of silver coins totalling $30,192.59 on behalf of the partnership. Thereafter the partnership transacted no further business. The partnership thus had silver sales totalling $164,997.60. Profits on these sales equalled $46,199.32, and petitioners' share thereof totalled $9,239.86. On April 11, 1962, petitioner entered into arrangements with Sigmund Janas for *174 the purpose of importing Mexican silver coins and selling them for their silver content in the United States. Petitioner contributed no capital, Janas contributed $50,000, and profits were to be divided equally. These arrangements constituted a partnership. Petitioner purchased silver coins on behalf of the partnership and, beginning July 19, 1962, sold these coins to the United States firm of Handy & Harman under an account entitled "Cia Minas, San Antonio." In September or October of 1962, one Gonzalez and the Swafford-Janas partnership entered into an agreement whereby Gonzalez put up $74,000 and was to receive 10 60 percent of the profits from the coin-selling operation while the Swafford-Janas partnership was to receive 40 percent. This agreement constituted a partnership. In late 1962, a dispute arose as to petitioner's share of the profits. Gonzalez persuaded petitioner to sell one final shipment of silver coins on behalf of the partnership to Engelhard Industries, Inc., a refiner located in Newark, New Jersey, which petitioner did on December 31, 1962. The proceeds from the sale received by Swafford from Engelhard were sent to Gonzalez" accountant, Victoriano Saldana. *175 Petitioner received $13,800 in 1962 as his share of profit on the Janas-Gonzalez partnership. We are satisfied that petitioner's distributive share of the profits for 1962 arising from such partnerships was at least that amount. [5] We need not concern ourselves as to whether such share exceeded that amount, because respondent, both in his notice of deficiency and on brief, has limited his assertion of income to petitioner from those transactions to $13,800. [6]
Petitioner also made two sales of silver coins for his own account to Engelhard Industries, Inc. - one in the amount of $1,099.33 on September 10, 1962 and one in the amount of $6,000 in December 1962. His profit on those sales was $307.81 and $1,680.00, *176 respectively, or a total of $1,987.81. On April 3, 1962, petitioner also sold a quantity of silver coins to the firm of Handy and Harman for his own account and received $7,719.13 on account of the sale. His profit was $2,161.35. By way of recapitulation, we find and hold that petitioner realized the following amounts of income in 1962: Thompson partnership
$9,239.86
Janas-Gonzalez partnership
13,800.00
Sales for own account
Englehard
1,987.81
Handy & Harmon
2,161.35
Total
$27,189.02
During 1962, petitioner incurred deductible business expenses of $5,763.08. 1963 In March of 1963, petitioner, unable to get a satisfactory accounting from Janas and Gonzalez as to his 12 share of partnership profits, tied up a shipment of silver coins imported by them at El Paso. By letter dated March 21, 1963, Janas terminated his partnership with Swafford. On July 8, 1963, petitioner received $15,000 from Janas and Gonzalez in return for releasing all claims upon the shipment. Petitioner paid his attorney $2,750 (including costs) for his services in the above matter. [7]
*177 We are satisfied that for 1963 petitioner's distributive share of the profits from the Janas-Gonzalez transactions was at least $12,250. As is the case with 1962, we need not concern ourselves as to whether such share exceeded that amount, because respondent, both in his notice of deficiency and on brief, has limited his assertion of income to petitioner from those transactions to $12,250. [8]
During the early part of 1963, petitioner sold some silver coins on his own account to Handy & Harman for 13 $11,843.43. His profit on these transactions totalled $3,316.16. After it became apparent that he was no longer in business with Janas and Gonzalez, petitioner entered into an oral agreement with Newell Hays and Joe Frazier to import and sell silver coins under the trade name of Eldorado Products.Hays and Frazier supplied the capital and petitioner the knowhow, and each was to receive an equal share in the anticipated profits. This arrangement constituted a partnership. The partnership lasted until June of 1963. Petitioner's share of the partnership profits was $3,500. Petitioner next formed a partnership known as South River Trading *178 Company to import and sell silver coins together with Joe H. Brown and his son Bruce. Petitioner, who had loaned Brown $8,800 earlier in the year, was credited with a capital contribution of $5,250 and a one-third interest in partnership profits and losses. Several sales of silver coins were made by the partnership to Handy & Harman; however, the assets of the partnership were exhausted when one of its employees absconded with a shipment of coins worth about 14 $25,000 and having a cost of $18,000. The partnership ceased doing business after the aforementioned theft. Petitioner's distributive share of the partnership loss was $1,666.67. [9]
Petitioner next went into the same business with Bobby Boyles, a local insurance broker, under the name Border Trading Company. The profits were to be shared equally but petitioner was to bear all the losses of the venture. The venture *179 constituted a partnership. It did not show any profit for 1963. [10]
By way of recapitulation, we find and hold that petitioner realized the following amounts of income and losses in 1963: Janas-Gonzalez partnership
$12,250.00
Sales for own account
3,316.16
Eldorado Products
3,500.00
South River Trading
(1,667.67)$0
Total
$17,399.49
Petitioner incurred deductible business expenses in 1963 of $11,355.86. 15 1964 Respondent concedes that there are no deficiencies or additions to tax against either of the petitioners for the taxable year. 1965 In January 1965, Al McCrae, Pepe Tinajero, and petitioner agreed to engage in the business of exporting mercury from Mexico to the United States, with profits to be split 45 percent, 10 percent, and 45 percent, respectively. These arrangements constituted a partnership. The business was financed entirely by McCrae out of the proceeds of his personal borrowing of $40,000. Petitioner and Tinajero contributed only their services, with the result that petitioner *180 had a zero basis for his partnership interest. Tinajero was to contact the miners, buy the mercury, and pay the necessary taxes. Swafford did not make any purchases personally because the price of mercury in Mexico to a "gringo" was too high to make a profit. Between February 9, 1965 and May 25, 1965, the partnership made sales of mercury totalling $488,273 to Associated Metals & Minerals Corporation; a New York corporation (hereinafter Associated). 16 [11] Partnership profits up to that point totalled $32,567.81. On June 2, 1965, Tinajero called Swafford and told him to bring two trucks into Mexico to pick up some mercury. Petitioner and two other persons drove in the trucks and picked up 111 flasks of mercury. On June 4, 1965, petitioner was arrested in Juarez, Mexico, and accused of trying to transport the mercury into the United States without payment of proper taxes and duties. The flasks of mercury were confiscated. They had a fair market value of $79,365 and a cost of $74,065.86. On November 27, 1965, petitioner was released, but all *181 efforts to recover the confiscated property failed. As a result thereof, the partnership terminated. Partnership losses, due to the confiscation, exceeded partnership income, with the result that the partnership suffered a net loss for tax purposes. Since petitioner had no basis for his partnership interest, he is not entitled to any deduction in respect of his share of such loss. In 1965, petitioner sold some silver coins to Handy & Harman on his own account, with gross receipts totalling $5,063.80; his profit was $1,417.86. 17 By way of recapitulation, we find that petitioners had realized $1,417.86 income. In 1965, petitioner incurred deductible business expenses of $22,049.40. 1966 During petitioner's incarceration in Mexico, he made the acquaintance of one Rudy Porras. In early 1966, after several unsuccessful attempts to ship silver to Handy & Harman in his own name, due to legal obstacles created by his continuing controversy with Janas, petitioner, using borrowed money, began selling Mexican silver coins to Handy & Harman on his own account but in the name of Rudy Porras. Gross sales totalled $57,602.26; petitioner's profit was $16,128.63. In September *182 of 1966, Thompson, James P. Hartnett, and petitioner made arrangements to go into business under the trade name of Elhart Trading Company (hereinafter Elhart) for the purpose of importing mercury from Mexico for sale in the United States. Profits were to be divided equally. The arrangements constituted a partnership. 18 Rudy Porras purchased mercury on behalf of Elhart. Petitioner and, occasionally, Hartnett and/or Thompson would fly with the mercury to the border, where it was passed through customs. In 1966, Elhart had sales of $247,779, on which the profits were $16,526.86, of which petitioner is chargeable with one-third, or $5,508.95. By way of recapitulation, petitioner realized income in 1966 as follows: Sales for own account
$16,128.63
Elhart
5,508.95
Total
$21,637.58
In 1966, petitioner incurred deductible business expenses totalling $22,262.55 and customs duties totalling $10,605. [12]
1967 Petitioner's participation in the Elhart partnership continued until May 2, 1967; his distributive share of taxable income, based on sales of mercury totalling $440,155, was $9,786.11. On April 7, 1967, petitioner *183 undertook to purchase mercury and resell it to Associated for his own account. 19 Between April 20, 1967 and December 4, 1967, Associated loaned petitioner from $10,000 to $60,000 at a time, taking back 90-day non-interest-bearing notes and confessions of judgment, all executed by petitioner and his wife. Petitioner also purchased and resold mercury for his own account to Dow Chemical of Canada, Ltd., and Browning Mineral & Ore Company. Petitioner had Porras do most of his purchasing for him. Porras purchased the mercury in Mexico and transferred it to the United States at El Paso. Frequently, Porras would not pay all necessary Mexican taxes, either duping the authorities by using one receipt for payment of taxes twice or bribing the appropriate customs agent. However, he always charged petitioner the full amount of taxes that should have been paid on every shipment. Such charges have been taken into account in the computation of the profit margin used herein. Other shipments of mercury involving one Arrelio Berrera came into the United States through Hidalgo, Texas. From May 2 until the end of the calendar year 1967, petitioner sold $1,748,357 of mercury to 20 *184 Associated, $69,160 of mercury to Dow Chemical, and $81,356.80 to Browning. His profit on these sales, which totalled $1,898,873, amounted to $126,654.88. Petitioner also continued to sell silver coins for his own account to Associated and Handy and Iharman. Gorss receipts from such sales totalled $169,327.46; [13] petitioner's profit was $47,411.69. By way of recapitulation, petitioner realized income in 1967 as follows: Elhart
$9,786.11
Associated, Dow & Browning
126,654.88
Sales for own account
47,411.69$0
Total
$183,852.68
In 1967 petitioner incurred deductible business expenses totalling $40,535.80 and customs duties totalling $104,055. [14]
Additions to tax There remains for consideration the various additions to tax determined against petitioner Beatrice Swafford under sections 6651(a), and 6653(a), and 6654 and against petitioner Ralph K. Swafford under sections 6653(b) and 6654. Before turning to these issues, we 21 note *185 that the fact that there may be loss carrybacks which may eliminate any tax for a particular year does not wipe out the existence of a deficiency for the purpose of computing any additions to tax. Petitioners are liable for such additions to tax on the basis of the existence of a deficiency computed without regard to such carryback. Nick v. Dunlap, 185 F. 2d 674 (C.A. 5, 1950); Charles F. Bennett, 30 T.C. 114, 122-123 (1958); John R. Rictor, 26 T.C. 913 (1956). Both Petitioners - Section 6654 Respondent asserted additions to tax against both petitioners under section 6654. It is not disputed that petitioners failed to make any estimated payments of tax during the years in question. The provisions of section 6654(a) [15] are mandatory; extenuating circumstances are irrelevant. Marko Durovic, 54 T.C. 1364, 1400 (1970), on appeal (C.A. 7, July 7, 1972); Estate of 22 Barney Ruben, 33 T.C. 1071, 1072 (1960). Neither petitioner has demonstrated that he or she cam within the protective umbrella of subsection (d). Marko Durovic, supra; John P. Reaver, 42 T.C. 72, 83 (1964). Therefore, to *186 the extent applicable, respondent's determination under section 6654(a) is sustained as to both petitioners. Petitioner Ralph K. Swafford - Section 6653(b) [16]
*187 During the years in question, petitioner kept no books regarding his business dealings, even though, with few, if any, exceptions, all invoices, receipts, etc., necessary to record his activities passed through his hands. Except for the transactions in 1967 not involving Elhart, petitioner's dealings were all in cash. With regard to the aforementioned 1967 transactions, petitioner frequently deposited only 23 part of his sales proceeds in his checking accounts and his checks reflecting transfers of money do not correlate with the claimed cost of his mercury and silver coin purchases. On January 14, 1964, petitioner, on his own initiative, gave the Internal Revenue Service information regarding the tax liability of one of his business colleagues. In May of 1965, Daisimay Stanley, an employee of the Internal Revenue Service office in El Paso, Texas, spoke with petitioner concerning his 1963 tax return; he directed her inquiries to his accountant. He also told Mrs. Stanley that he had filed his 1963 return, but not his 1964 return, that the latter was being prepared by his accountant, and that he would show her his 1963 return later that week, although he knew that no such *188 return existed. In response to Mrs. Stanley's inquiries through the better part of 1966, petitioner's accountant told her he would prepare petitioner's returns for 1963 and 1964 as soon as petitioner supplies him with the necessary information and records. 24 In 1967, an Internal Revenue Agent was assigned to petitioner's case. After petitioner failed to return several phone calls, the agent went to petitioner's home without advance notice, on October 10, 1967, at which time he spoke to petitioner, who referred him to his accountant. At a conference several days later with petitioner, his accountant, and an accountant associate of the latter, the agent learned that petitioner had not filed any returns for some time, that the accountant was in the process of preparing these returns, and that they would be filed as soon as petitioner provided the records necessary to complete filling them out. After petitioner's failure to file the necessary returns, the agent examined what records petitioner had submitted to his accountant and found that they contained no receipts or invoices reflecting petitioner's mercury and silver transactions, except for random scraps of paper with *189 names and numbers on them. The existence of fraud is a question of fact and, under section 7454(a), the burden of proof is upon the respondent. Anson Beaver, 55 T.C. 85 (1970). 25 Fraud is never presumed; it must affirmatively be established by clear and convincing evidence. Carter v. Campbell, 264 F. 2d 930 (C.A. 5, 1959); Anson Beaver, supra, 55 T.C. at 92. At the same time, it is axiomatic that direct proof of fraud is seldom possible and that a finding of fraud can be based upon the taxpayer's conduct with respect to the underlying transactions involved. See Leon Papineau, 28 T.C. 54, 57-58 (1957). In the instant case, petitioner failed to file any returns for the years in question. While such circumstance does not, in and of itself, justify the imposition of the fraud penalty ( Cirillo v. Commissioner, 314 F. 2d 478 (C.A. 3, 1963), reversing in part and affirming in part on other grounds a Memorandum Opinion of this Court; Anson Beaver, supra, 55 T.C. at 93), it is clearly a relevant element, if not persuasive evidence, of an intent to defraud the Government. Stoltzfus v. United States, 398 F. 2d 1002 *190 (C.A. 3, 1968); Cirillo v. Commissioner, supra.
In May of 1965, petitioner told an employee of the Internal Revenue Service he had filed his 1963 return, knowing full well that he had not. Cf. Anson 26 Beaver, supra, 55 T.C. at 93. [17] Throughout the period in question, petitioner failed to maintain any records of his business dealings, even though he knew his accountant could file no returns without past or present records; yet, he did not make even a half-hearted attempt to maintain any records whatsoever for 1965 and beyond, thus frustrating his accountant's attempts to prepare returns for the years in question. He avoided having accurate knowledge of his income at a time when he was aware that such knowledge was necessary - in itself a substantial indication of fraudulent intent. Albert Gemma, 46 T.C. 821, 834 (1966). Petitioners failure for several consecutive years to keep records or file returns, and the carrying on of business involving large amounts, primarily in cash, constitutes conduct evidencing fraud. Cf. *191 Albert Gemma, supra. Such conduct is aggravated by his failure to keep records in 1967, at a time when he knew he would be audited and that his accountant's failure to prepare returns for prior years was due to 27 lack of adequate records. Cf. Powell v. Granquist, 252 F. 2d 56 (C.A. 9, 1958). Petitioner, throughout the trial, contended that he did not file any returns because, in each year he was engaged in partnerships, other members of those partnerships kept the records, and he was unable to obtain from his partners information as to how much profit or loss was being made. Assuming without deciding that such testimony, if credible (as to which we have serious doubts), might militate against a finding of fraud, such assertion affords petitioner no solace. In the first place, with few, if any, exceptions, all invoices, receipts, etc., necessary to record petitioner's activities passed through his hands. Moreover, as far as the record herein is concerned, petitioner's main difficulties were with Janas Gonzalez in 1962 and 1963. But, petitioner actually received $13,800 and $15,000, respectively, in each of those years in his distributive share *192 of the profits of the partnerships with those two individuals. He failed to report either of these sums in the year received and respondent has not 28 sought to tax petitioner on any amount of partnership profits in excess of such sums. Under these circumstances, we think the availability or lack of availability to petitioner of any records of partnership profits or losses is immaterial. Additionally, these amounts in and of themselves were in excess of any deductions to which petitioner was apparently otherwise entitled. Cf. Lowy v. Commissioner, 288 F. 2d 517 (C.A. 2, 1961), affirming a Memorandum Opinion of this Court; Aaron Hirschman, 12 T.C. 1223, 1229 (1949). Finally, we note that, with respect to every other partnership, at least one member testified at the trial but none of them was asked whether petitioner had requested any records and whether he (the witness) had refused to make them available to petitioner. Under these circumstances, we find petitioner's contention unfounded. The foregoing considerations, together with other elements gleaned from the trial and from our careful consideration of the entire record herein, [18] lead us *193 29 to conclude that the badges of fraud are unmistakable and that respondent has carried his burden by clear and convincing evidence in respect of all of the taxable years still in dispute. We have reached this conclusion keeping in mind that respondent's burden is satisfied by showing that "any part" of an underpayment is due to fraud. Section 6653(b); Kathleen C. Vannaman, 54 T.C. 1011, 1020 (1970); Arlette Coat Co., 14 T.C. 751, 756 (1950). In this connection, we note that if, as a result of our findings herein, there is no deficiency in tax for a particular year (computed without regard to any loss carrybacks, see p. 21, supra ), there is no underpayment and, therefore, no addition to tax for fraud can be imposed. Section 6653(b). *194 Petitioner Beatrice Swafford - Sections 6651(a) and 6653(a) Respondent determined additions to tax against petitioner Beatrice Swafford under section 6651(a) (failure to file timely return unless reasonable cause exists for not so doing) and section 6653(a) (underpayment of tax due to negligence or intentional disregard of rules and regulations). The burden of proof is on the taxpayer to show that these determinations are in error. Electric & Neon, Inc.56 T.C. 1324, 1342 (1971); Robert L. Bunnel, 50 T.C. 837, 843 (1968); Robinson's Dairy, Inc., 35 T.C. 601 (1961), AFFD. 302 F. 2d 42 (C.A. 10, 1962). The contention is made that the necessary records for preparing the returns in question were allegedly not available to Mrs. Swafford just as they were not available to her husband. We have already voiced our views on this factual contention, and we see no reason to reiterate them. Mrs. Swafford, at the very least, should have furnished the Internal Revenue Service with what information she had and asked for an extension of time to file proper returns. [19] In this latter 31 connection, we note that Mrs. Swafford *195 did not testify and we have no evidence in the record from which we can determine her participation or nonparticipation in her husband's business affairs [20] or her knowledge or lack of knowledge of the information on the basis of which she could have filed some kind of return. We find that petitioner Beatrice Swafford has failed to sustain her burden of proof and consequently we hold that, to the extent applicable, respondent's determination of additions to tax against her under sections 6651(a) and 6653(a) should be sustained. Decisions will be entered under Rule 50. [21]
*196 APPENDIX 1962 (a) Sales of silver coins in Thompson's name - Thompson venture: January 22
$14,370.00
January 29
17,000.00
February 12
5,818.08
February 14
26,000.00
February 21
18,836.00
March 7
23,354.00
March 13
7,606.00
March 13
4,633.44
April 10
8,717.24$0
$126,334.76
(b) Sales of silver coins in Swafford's name - Thompson venture: March 7
$7,210.00
April 10
1,260.25
May 9
22,295.00
242.32
608.09
3,580.18
3,467.00
38,662.84
Total
$164,997.60
(c) Swafford sales of silver coins for own account: April 3
$6,563.00
1,156.13
$7,719.13
September 10
1,099.33
December 21
6,000.00
Total
$14,818.46 33 1963 Swafford sales of silver coins for own account: January 16
$2,850.00
February 1
430.57
February 27
1,207.50
March 6
1,786.00
March 11
2,467.00
3,102.37
Total
$11,843.43
1965 (a) Sales of mercury - Partnership sales - McCrae-Swafford-Tinajero: April 9
$50,600.00
April 30
7,540.00
May 7
38,745.00
May 10
22,755.00
May 13
43,885.00
May 17
22,270.00
May 18
20,550.00
May 21
50,005.00
May 24
70,118.00
May 24
41,785.00
May 25
4,200.00
May 28
39,200.00
June 1
74,880.00
August 2
1,740.00$0
$488,273.00
*197 (b) Swafford sales of silver coins for own account: May 3
$777,39
3,347.91
938.50
$5,063.80 34 1966 (a) Sales of silver coins in Porras's name for Swafford's account: March 7
$2,319.80
April 15
1,202.24
May 13
4,112.98
May 13
6,307.20
July 11
4,024.83
July 25
1,131.99
August 23
6.096.95
October 4
2,095.52
October 12
20,441.50
November 28
9,869.25
Total
$57,602.26
(b) Sales of mercury - Elhart: (1) to Associated:
October 11
$18,430.00
October 28
28,000.00
December 1
22,795.00
December 5
27,900.00
December 9
28,980.00
December 15
27,714.00
December 22
23,712.00
December 31
4,594.00
December 31
16,994.00
$199,119.00
(2) to Dow Chemical:
November 4
$29,700.00
November 8
7,560.00
37,260.00
(3) to Jackson Associates:
November 16
$11,400.00
11,400.00
Total
$247,779.00 35 1967 (a) Elhart sales of mercury to Associated: January 6
$24,486
March 22
$47,322
January 21 )
53,580
March 29
28,200
January 27 )
April 7
34,875
February 3
35,437
April 14
27,265
February 14
28,853
April 26
35,475
March 14
29,398
May 1
25,650
March 15
40,934
March 18
28,680
$440,155
*198 (b) Mercury sales by Swafford for his own account: (1) to Associated:
May 5
$32,970
September 8
$95,600
May 8
27,594
September 8
47,800
May 15
25,370
September 15
38,212
May 23
34,096
September 29
44,992
May 31
8,600
October 6
93,000
May 31
20,032
October 11
25,580
June 7
10,260
October 13
111,162
June 7
28,080
October 14
41,496
June 13
36;075
October 0124
28260
June 24
35,610
October 27
46,433
July 1
32,600
November 1
28,800
July 12
34,576
November 7
18,135
July 21
28,897
November 10
53,675
July 25
32,835
November 13
30,464
July 28
26,100
November 21
89,053
August 5
33,045
November 31[sic]
28,800
August 18
105,782
December 4
67,281
August 18
65,584
December 14
34,119
August 25
68,036
December 18
59,883
September 1
45,479
December 26
33,991
$1,748,357 36 (2) to Dow Chemical: July 21
$35,035.00
August 10
34,125.00
$69,160.00
(3) to Browning: July 21
$35,035.00$ (3) to Browning: July 21
$35,035.00
August 10
34,152.00
$69,160.00 (3) to Browning: August 25
45,500.00
September 8
35,856.80
81,356.80
Total
$1,898,873.80
*199 (c) Silver coin sales by Swafford for his own account: February 6
$8,896.81
February 6
1,667.22
October 11
40,957.98
October 12
25,775.09
November 21
77,860.76
December 27
14,169.60
$169,327.46
Footnotes
1. All references are to the Internal Revenue Code, as amended and as applicable to the taxable years in question. ↩
2. Respondent also conceded at the opening of trial that, for various reasons, the deficiencies in dispute aggregate roughly one-half of the amounts set forth in the notice of deficiency.↩
3. Unfortunately, respondent's brief was not prepared and submitted by counsel who participated in the trial. ↩
4. The parties are in agreement that one-half of any amounts of income found to have been derived from such transactions should be charged to each of the petitioners herein. ↩
5. In litigation in the California courts between Janas and petitioner, a judgment was entered in 1972 which reflects an amount in excess of $13,800. ↩
6. Under these circumstances, we need not consider whether the existence of litigation (see footnote 5, supra, ) would enable petitioner to avoid tax on the excess of his distributive share of profits over the amount actually received. Cf. Beck Chemical Equipment Corporation, 27 T.C. 840↩ (1957). 11 7. The parties have stipulated that petitioner incurred business expenses of $11,355.86 in 1963. This sum does not include the aforesaid fee, but respondent has reflected a deduction of this fee in computing the amount of income chargeable to petitioner. ↩
8. See footnote 6, supra. ↩
9. The partnership had earned $13,000 before the theft. The theft, therefore, created a business loss for the venture of $5,000. We have no evidence upon which we can make any determination as to whether petitioner suffered a loss in respect of the remainder of his basis in the partnership interest. ↩
10. There is no evidence in the record to indicate whether the partnership suffered any losses in 1963. It ceased operations in 1964. ↩
11. Payments attributable to these sales were received as late as August 2, 1965 and are reflected in our Appendix, infra. ↩
12. See footnote 21, infra. ↩
13. This includes an advance payment of $14,169.60 received by Swafford on December 27, 1967 from Associated on account of a sale bearing an invoice date of January 9, 1968. ↩
14. See footnote 21, infra. ↩
15. SEC. 6654. FAILURE BY INDIVIDUAL TO PAY ESTIMATED INCOME TAX. (a) Addition to the Tax. - In the case of any underpayment of estimated tax by an individual, except as provided in subsection (d), there shall be added to the tax under chapter 1 and the tax under chapter 2 for the taxable year an amount determined at the rate of 6 percent per annum upon the amount of the underpayment (determined under subsection (b)) for the period of the underpayment (determined under subsection (c)). ↩
16. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. ↩
17. See also Harold S. Lutsko T.C. Memo, 1969-78; Herbert C. Broyhill, T.C. Memo. 1968-25↩. 18. Petitioner's course of conduct with the Internal Revenue agents and our serious doubts as to his claim of inability to get partnership records are in and of themselves insufficient to sustain our finding of fraud. But they are circumstances which may be taken into account in determining whether petitioner had the necessary fraudulent intent at the time when his taxes were due and he failed to pay them. We recognize that the weight to be accorded these factors is only peripheral, which, indeed, is the treatment we have accorded them herein. In the same vein, we note that we have given no weight whatsoever to various stipulations of fact as to certain personal expenditures of petitioner such as for the purchase of automobiles, horses, and cemetery lots. 30 ↩
19. See Robert J. Hackett, T.C. Memo. 1970-17↩. 20. We note that she executed the notes and confessions of judgment in favor of Associated. See p. 19, supra. ↩
21. At the trial, respondent reserved his position as to the stipulated deductions for business expenses and customs duties on the ground that there should be a proration of those items in the event that we should find that the petitioner was not chargeable with all the sales at issue in their entirety. The Court accepted that reservation as regards the customs duties, because such a proration was capable of ready calculation, but not as to the business expenses, where the proration was not capable of such calculation, leaving the question of proration of those expenses and the location of the burden of proof in respect thereof to be argued by respondent on brief if he so chose. Respondent's brief is silent on the point and, accordingly, we deem him to have abandoned the issue, with the result that the stipulated amounts of business expense will control. The customs duties will be prorated in the Rule 50 computation. 32 ↩