PATRICK H. KOFMEHL AND LINDA M. KOFMEHL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kofmehl v. Commissioner
Docket No. 8845-74.
United States Tax Court
T.C. Memo 1978-439; 1978 Tax Ct. Memo LEXIS 70; 37 T.C.M. (CCH) 1831; T.C.M. (RIA) 78439; November 6, 1978, Filed *70 Held: On these facts, where books and records maintained by taxpayer were inadequate, respondent was justified in reconstructing petitioner's income using cash basis net worth method notwithstanding the existence of inventories of petitioner. Thus, deficiencies were properly determined. Held further: The additions to tax under sec. 6653(b), I.R.C. 1954, denied for 1967, and upheld for 1968 and 1969. Robert E. Kovacevich and Richard P. Algeo, for the petitioners. Matthew W. Stanley, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax pursuant to section 6653(b)[1] as follows: Addition to tax Year
Deficiency
Section 6653(b)
1967
$ 2,268.10
$ 1,134.05
1968
15,898.78
7,949.39
1969
21,162.05
10,581.02
1970
926.00
The 1970 adjustment is dependent upon the amount of unreported income ultimately determined for the three preceding years. At the close of his case at trial, respondent requested the Court to grant leave to amend his pleadings. That request was granted and in an amended answer respondent increased his proposed deficiency for the taxable year 1967 to $ 3,141.01. The issues for our decision are: (1) *72 Whether petitioners failed to report gross income during the taxable years 1967, 1968 and 1969; and (2) Whether, pursuant to the provisions of section 6653(b), petitioners' underpayment of tax, if any, was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts along with attached exhibits are incorporated herein by this reference. Petitioners, husband and wife, were residents of Spokane, Washington at the time of filing their petition herein. They filed their joint Federal income tax returns for the taxable years 1967 through 1970 with the Western Regional Service Center, Ogden, Utah. For the taxable years 1967 through 1969, petitioners filed their returns utilizing the cash method of accounting. Since Linda M. Kofmehl is a party hereto solely by reason of having filed a joint return with her husband for the years in issue, references to petitioner will hereafter be considered as references to Patrick only. From 1965 until December 1966, petitioners resided in a duplex at 903-905 Mountain View, Spokane, Washington. During the first part of 1967, they rented a house located at 8011 Hughes Drive, also in Spokane. From the middle *73 of 1967 until November 1968 they resided at West 109 Westview, Spokane, and in November 1968, they moved to North 4517 Center Road, Spokane, where they resided at the time of trial. After serving four years, petitioner was discharged from the Air Force in 1965. Using $ 10,000 he had saved, he purchased some land in the Spokane area, land which he subsequently sold. Then, with the aid of his father-in-law, Joe Miller, petitioner built a duplex at 903-905 Mountain View, part of which served as his personal residence until December of 1966. Simultaneously therewith, petitioner began an apprenticeship under Joe Miller, learning the trade of residential home construction. Joe Miller was regarded as one of the foremost residential home builders in Spokane, and an apprenticeship under him was regarded favorably by those in the construction and related businesses with whom petitioner would eventually deal. Petitioner began contracting the construction of residential homes on his own in 1967. He personally constructed each house which he sold, utilizing only subcontractors. It also appears that he continued to receive advice from Joe Miller. In March 1966, petitioner purchased *74 property known as the "Indian Trail" property for $ 12,000. As of December 31, 1966, he still owed a balance on this purchase of $ 4,083. In May 1967, he sold that property for $ 20,000, receiving $ 8,000 down with the remaining $ 12,000 to be paid through an escrow account established at the Old National Bank of Washington in Spokane. As of the end of 1967, 1968 and 1969, the balances due petitioner on this sale were $ 12,000, $ 8,816 and $ 6,683, respectively. During 1967, petitioner sold four houses ranging in price from $ 13,950 to $ 22,900. Additionally, he sold the Mountain View duplex for $ 28,500. In 1968, the number of houses sold by petitioner increased to six, ranging in price from $ 17,500 to $ 23,500. He did not report one of these sales (University Road) and also underreported the sale of his personal residence by $ 6,000 (Westview). As part of the consideration for the sale of 8310 East Maringo in Spokane, to John and Dawn Eacho, petitioner took a residence located at East 3933 Euclid in trade and on which the parties to the transaction placed a value of $ 11,500. The details of the transaction were as follows: CREDITS
CREDITS
Sale price
$ 21,500.00
Mortgage reserves
180.50
Maringo taxes: $ 10.78, prorated
as of 10/68
.63
*75 CHARGES
Excise tax $ 215.00
Title Insurance
67.93
Interest adjustment 12/1 to
12/10
32.59
Revenue stamps
5.50
Recording fee
2.00
Attorney fee
72.00
Deed of Trust assumed
16,185.18
Transfer of Euclid property
(trade in)
11,500.00
Sewer Assessment: $ 1,291.53
(one-half to each)
645.76
Euclid taxes: $ 192.45,
prorated as of 12/10
11.07
Due from Sellers
7,055.90
$ 28,737.03
$ 28,737.03
On their 1968 return, petitioners deducted the $ 7,055.90 which they paid the Eachos. Although owned by petitioner, the Maringo residence was used by Gerald Kofmehl, petitioner's brother, on a rent free basis. Petitioner also deducted a driver's license fee, a traffic fine and the cost of a horseshoeing in 1968. In 1969, petitioner sold or traded seven houses which he had constructed, with sale prices ranging from $ 22,950 to $ 30,500. One of these transactions was entered into with Herbert Thompson whereby petitioners acquired a motel located at East 1704 Sprague in Spokane at a stated price of $ 58,000. In exchange for the motel, petitioners conveyed free and clear a house and lot located at North 4522 Center Road and assumed a $ 28,000 *76 mortgage on the motel. The house conveyed was valued by the parties at $ 30,000 (petitioners paid an excise tax to the state of Washington based upon the $ 30,000 value) and a construction loan in the amount of $ 22,800 had been approved for the property. Petitioner did not report either the house-motel exchange or the sale of the house at North 4510 Center Road on his 1969 return. Also, during 1969, petitioners sold their former personal residence at West 109 Westview for $ 24,950. In partial payment of the sales price, they accepted a house in trade located at North 5216 Stevens. This house was also sold in 1969 for $ 14,500. Finally, during both 1968 and 1969, petitioner deducted as business expenses the costs of constructing his residence at North 4517 Center Road. A schedule of petitioners' real estate sales transactions for 1967, 1968 and 1969 is set forth below: Contract
Date of Sale
Purchaser
Location of Property Sold
Price
02/10/67
Leroy H. Risdon
903-905 Mt. View Avenue
$ 28,500.00
& Kathleen
Spokane, Wash.
05/03/67
Edward E. Midgley
E. 1108 Pinetree Drive
18,900.00
& Afton
Spokane, Wash.
08/13/67
Dorothy R. Zack
N. 5008 Ash
13,950.00
Spokane, Wash.
10/18/67
George Martgluo
2013 W. Providence
22,900.00
Spokane, Wash.
08/15/67
Murray A. Nash &
W. 2011 Providence
20,890.72
Effie Jean
Spokane, Wash.
05/17/67
Joan E. Paisley
S.W. 1/4, Sec. 10 Tws. 26
20,000.00
Known as Indian Trail
01/24/68
Robert E. Dixon,
S. 2704 University Rd.
Jr. and wife
Spokane, Wash.
21,900.00
05/21/68
Gary D. Smith
E. 14010 Mallon
Spokane, Wash.
18,045.00
05/27/68
James C. Wilker-
E. 8302 Maringo
21,500.00
son
Spokane, Wash.
06/05/68
David Neal
E. 14006 Mallon
17,500.00
11/21/68
Arthur N. Evans
E. 14022 Mallon
23,500.00
& Jean Rea
Spokane, Wash.
12/10/68
John Eacho and
8310 E. Maringo
21,500.00
24,950.00 - Personal
Dawnelda
Spokane, Wash.
12/00/68
Guy A. Melberg
W. 109 Westview
24,950.00
or
& Laura M.
Spokane, Wash.
01/10/69
01/15/69
Norman P. Hill
N. 5816 Stevens
14,500.00
Spokane, Wash.
02/12/69
Walter W. Madden
E. 14016 Mallon
22,950.00
& LaLanie
Spokane, Wash.
04/01/69
Richard L. Price
N. 4707 Ella
31,500.00
Spokane, Wash.
05/01/69
Harold H. Thomp-
N. 4421 Ely
28,700.00
son
Spokane, Wash.
06/06/69
Herbert E. Thomp-
N. 4522 Center Rd.
30,000.00
son
Spokane, Wash.
06/09/69
Donald D. Rohrer
4510 N. Center Rd.
31,500.00
Spokane, Wash.
08/15/69
Donald T. Meier
4512 N. Ely Rd., Spokane, Wa.
30,000.00
10/29/69
Robert E. Hull
N. 4515 Ely Rd., Spokane, Wa.
30,150.00
*77 Actual Amount
Date of Sale
Purchaser
Location of Property Sold
Realized
02/10/67
Leroy H. Risdon
903-905 Mt. View Avenue
$ 28,500.00
& Kathleen
Spokane, Wash.
05/03/67
Edward E. Midgley
E. 1108 Pinetree Drive
18,900.00
& Afton
Spokane, Wash.
08/13/67
Dorothy R. Zack
N. 5008 Ash
13,950.00
Spokane, Wash.
10/18/67
George Martgluo
2013 W. Providence
22,900.00
Spokane, Wash.
08/15/67
Murray A. Nash &
W. 2011 Providence
20,890.72
Effie Jean
Spokane, Wash.
05/17/67
Joan E. Paisley
S.W. 1/4, Sec. 10 Tws. 26
20,000.00
Known as Indian Trail
01/24/68
Robert E. Dixon,
S. 2704 University Rd.
Jr. and wife
Spokane, Wash.
18,400.00
05/21/68
Gary D. Smith
E. 14010 Mallon
Spokane, Wash.
18,045.00
05/27/68
James C. Wilker-
E. 8302 Maringo
21,500.00
son
Spokane, Wash.
06/05/68
David Neal
E. 14006 Mallon
17,500.00
11/21/68
Arthur N. Evans
E. 14022 Mallon
23,500.00
& Jean Rea
Spokane, Wash.
12/10/68
John Eacho and
8310 E. Maringo
21,500.00
24,950.00 - Personal
Dawnelda
Spokane, Wash.
12/00/68
Guy A. Melberg
W. 109 Westview
24,950.00
or
& Laura M.
Spokane, Wash.
01/10/69
01/15/69
Norman P. Hill
N. 5816 Stevens
14,500.00
Spokane, Wash.
02/12/69
Walter W. Madden
E. 14016 Mallon
22,950.00
& LaLanie
Spokane, Wash.
04/01/69
Richard L. Price
N. 4707 Ella
29,500.00
Spokane, Wash.
05/01/69
Harold H. Thomp-
N. 4421 Ely
28,700.00
son
Spokane, Wash.
06/06/69
Herbert E. Thomp-
N. 4522 Center Rd.
30,000.00
son
Spokane, Wash.
06/09/69
Donald D. Rohrer
4510 N. Center Rd.
30,500.00
Spokane, Wash.
08/15/69
Donald T. Meier
4512 N. Ely Rd., Spokane, Wa.
30,000.00
10/29/69
Robert E. Hull
N. 4515 Ely Rd., Spokane, Wa.
29,150.00
*78 Business
Date of Sale
Purchaser
Location of Property Sold
Sale
02/10/67
Leroy H. Risdon
903-905 Mt. View Avenue
& Kathleen
Spokane, Wash.
05/03/67
Edward E. Midgley
E. 1108 Pinetree Drive
$ 18,900.00
& Afton
Spokane, Wash.
08/13/67
Dorothy R. Zack
N. 5008 Ash
13,950.00
Spokane, Wash.
10/18/67
George Martgluo
2013 W. Providence
22,900.00
Spokane, Wash.
08/15/67
Murray A. Nash &
W. 2011 Providence
20,890.72
Effie Jean
Spokane, Wash.
05/17/67
Joan E. Paisley
S.W. 1/4, Sec. 10 Tws. 26
Known as Indian Trail
01/24/68
Robert E. Dixon,
S. 2704 University Rd.
Jr. and wife
Spokane, Wash.
18,400.00
05/21/68
Gary D. Smith
E. 14010 Mallon
Spokane, Wash.
18,045.00
05/27/68
James C. Wilker-
E. 8302 Maringo
21,500.00
son
Spokane, Wash.
06/05/68
David Neal
E. 14006 Mallon
17,500.00
11/21/68
Arthur N. Evans
E. 14022 Mallon
23,500.00
& Jean Rea
Spokane, Wash.
12/10/68
John Eacho and
8310 E. Maringo
21,500.00
24,950.00 - Personal
Dawnelda
Spokane, Wash.
12/00/68
Guy A. Melberg
W. 109 Westview
or
& Laura M.
Spokane, Wash.
01/10/69
01/15/69
Norman P. Hill
N. 5816 Stevens
Spokane, Wash.
02/12/69
Walter W. Madden
E. 14016 Mallon
22,950.00
& LaLanie
Spokane, Wash.
04/01/69
Richard L. Price
N. 4707 Ella
29,500.00
Spokane, Wash.
05/01/69
Harold H. Thomp-
N. 4421 Ely
28,700.00
son
Spokane, Wash.
06/06/69
Herbert E. Thomp-
N. 4522 Center Rd.
son
Spokane, Wash.
06/09/69
Donald D. Rohrer
4510 N. Center Rd.
30,500.00
Spokane, Wash.
08/15/69
Donald T. Meier
4512 N. Ely Rd., Spokane, Wa.
30,000.00
10/29/69
Robert E. Hull
N. 4515 Ely Rd., Spokane, Wa.
29,150.00
*79 Sale of
Date of Sale
Location of Property Sold
Capital Asset
02/10/67
903-905 Mt. View Avenue
$ 14,250.00- Duplex, one
Spokane, Wash.
unit personal
residence
05/03/67
E. 1108 Pinetree Drive
Spokane, Wash.
08/13/67
N. 5008 Ash
Spokane, Wash.
10/18/67
2013 W. Providence
Spokane, Wash.
08/15/67
W. 2011 Providence
Spokane, Wash.
05/17/67
S.W. 1/4, Sec. 10 Tws. 26
20,000.00 - Land held for
Known as Indian Trail
investment
01/24/68
S. 2704 University Rd.
Spokane, Wash.
05/21/68
E. 14010 Mallon
Spokane, Wash.
05/27/68
E. 8302 Maringo
Spokane, Wash.
06/05/68
E. 14006 Mallon
11/21/68
E. 14022 Mallon
Spokane, Wash.
12/10/68
8310 E. Maringo
24,950.00 - Personal
Spokane, Wash.
12/00/68
W. 109 Westview
24,950.00 - Personal
or
Spokane, Wash.
residence
01/10/69
01/15/69
N. 5816 Stevens
14,500.00 - Received in
Spokane, Wash.
trade on sale
of W. 109
Westview
02/12/69
E. 14016 Mallon
Spokane, Wash.
04/01/69
N. 4707 Ella
Spokane, Wash.
05/01/69
N. 4421 Ely
Spokane, Wash.
06/06/69
N. 4522 Center Rd.
Spokane, Wash.
06/09/69
4510 N. Center Rd.
Spokane, Wash.
08/15/69
4512 N. Ely Rd., Spokane, Wa.
10/29/69
N. 4515 Ely Rd., Spokane, Wa.
*80 On their joint Federal income tax returns for 1967, 1968 and 1969, petitioners reported the following amounts of real estate sales on Schedule C and total income (loss): Year
Sales
Income (loss)
1967
$ 80,900.00 $ 526.44
1968
120,400.00
(1,254.36)
1969
153,105.46
8,573.12
No Schedule D (capital gains and losses) was included in any of these returns, nor were any non-business deductions claimed on the 1967 or 1968 returns. Petitioner's method of operation was basically as follows. Initially, he would secure favorable lot sites for the future construction of homes. Once a building site was established, petitioner would secure construction loan financing from local lending institutions. Then, petitioner would set about the actual construction of the proposed home. Materials and supplies were obtained from local suppliers on open account. Payment was generally required by the 10th of the month following the month of purchase so as to obtain a two percent discount on the purchase price. This permitted petitioner up to 40 days in which to make payment and still obtain the two percent discount. Although petitioner did not always make payment *81 in time to receive the discount, he was usually very prompt about paying his bills. This purchasing on open account was employed so as not to "draw down" on his established construction loan financing and, thus, avoid the interest expense accruing on the draws.To the extent he was successful in avoiding draws against the construction loans he had obtained, he was able to build on the credit of his suppliers. Upon completion of a house, petitioner would draw the amount of the construction loan.The loan proceeds were customarily deposited by petitioner in either his savings or his checking account at which time he would pay any unpaid material suppliers. He also purchased lots through his checking account. During the years in issue, petitioner would often have more than one house under construction at any given time, thus promoting efficient construction. The result of this method of construction was that construction financing obtained for a specific piece of property would not necessarily go to paying the suppliers of materials consumed in the construction of that particular house. On August 22, 1974, respondent issued a statutory notice of deficiency to petitioner, determining *82 deficiencies in income tax for his taxable years 1967, 1968, 1969 and 1970. The deficiencies for the years in issue were determined by respondent's utilization of the so-called "net worth" method of reconstructing income. In addition, respondent asserted an addition to tax for fraud under section 6653(b) for the years 1967, 1968 and 1969. Petitioner had homes in various stages of progress at the end of both 1968 and 1969. In the notice of deficiency, respondent assigned values of $ 22,400, $ 16,400, $ 19,550, and $ 24,000 to the value of inventory as of December 31, 1966, 1967, 1968 and 1969, respectively. Respondent also assumed that there were outstanding accounts payable in amounts equal to inventory as of the end of the respective years. Thus, the annual increase in assets due to inventory was offset by an equal increase in liabilities. The net worth reconstruction which respondent utilized in his answer and at trial did not take into account inventory or trade payables as did the method of reconstruction utilized in the notice of deficiency. However, as indicated above, that initial net worth reconstruction was made under the assumption that the value of homes in progress *83 was equal to the payables associated therewith, thus eliminating any difference between the two methods of income reconstruction.As a result there is no material difference resulting from the two different approaches to inventory and related payables. Based on the net worth reconstruction utilized at trial, the elements of which are largely stipulated to, respondent determined the following: 1967
1968
1969
Adjusted gross income
as corrected
$ 15,794.44
$ 43,952.90
$ 54,884.84
Adjusted gross income
per return
526.44
(1,254.36)
8,573.12
Understatement of ad-
justed gross income
$ 15,268.00
$ 45,207.26
$ 46,311.72
Pursuant to respondent's audit of petitioners' Federal income tax returns for the taxable years in issue, special agent, Gary Helleckson (hereafter Helleckson), conducted at least two interviews of petitioner. During one of these interviews, petitioner was asked to characterize payments he had made to his brother, Gerald, in 1967, 1968 and 1969. Petitioner replied that the payments represented wages, and indeed, he deducted a large portion of the approximately $ 15,000 in payments he made to his brother over the three-year period. *84 However, after interviewing petitioner's brother, Gerald, on July 16, 1971, and learning that Gerald considered the payments to have represented loans, Helleckson reinterviewed petitioner on July 17, 1971, again inquiring about the nature of the payments. Petitioner this time told Helleckson that the payments were loans. Also, during the initial interview of petitioner in 1970, Helleckson asked him if he had ever received any gifts or inheritances. Petitioner replied that other than Christmas and birthday gifts he had received one gift of substance, $ 1,000, from his father-in-law, Joe Miller.
For tax purposes during the years in issue, petitioners generally reported sales of homes in the year in which the sales took place and deducted expenses incurred in the year in which the expenses were paid. Rather than deduct the cost of land in the year in which it was purchased, land costs were deducted from sales prices to determine profit. In each year petitioner had a return preparer complete his return. The only sources of funds available to petitioner during the years 1967 through 1969 were proceeds from the sale of property, draws on construction loans, Christmas gifts, and *85 the $ 1,000 received from Joe Miller. Virtually all of petitioner's receipts passed through his checking account and his expenses, including the costs of construction, were almost always paid by check. During the years in issue petitioner filed three financial statements with Fidelity Mutual Savings Bank and one financial statement with Lincoln Savings and Loan.On May 5, 1967, he filed a financial statement showing a net worth of $ 63,013.50, and an estimated income of $ 12,400. On November 25, 1968, petitioner filed another such statement showing a net worth of $ 148,800 and estimated annual income of $ 12,000. Sometime during that same year, he also filed a financial statement with Lincoln Savings and Loan showing his annual income to be $ 40,000 and his net worth to be $ 91,900. Finally, on January 31, 1970, petitioner filed a statement showing his net worth to be $ 220,600. ULTIMATE FINDINGS OF FACT Petitioner's understatement of income for the year 1967 was not due to fraud. Petitioner's understatement of income for the years 1968 and 1969 was due to fraud.
OPINION Petitioner has challenged both the deficiency determination and the propriety of the 50-percent *86 additions to tax for fraud. In doing so, he levels four arguments against the validity of respondent's net worth reconstruction of income. First, he contends that respondent was aware of extensive year end inventories and payables which were ignored when respondent made the net worth reconstruction presented at trial. Second, petitioner alleges that respondent's net worth reconstruction contains material errors, impeaching its credibility as an accurate reflection of petitioner's income. Third, petitioner alleges that a comparison of the percentage mark-up method of determining income with respondent's net worth analysis establishes that the net worth analysis does not clearly reflect income. Finally, petitioner asserts that respondent has failed to establish any likely sources of income to support his alleged increases in net worth.While petitioner does not contest respondent's authority to reconstruct his income, he seems to imply that errors in respondent's method of proof render the determination arbitrary, thus shifting the burden of proof to respondent. We will first deal with petitioner's basic attack on the use of the cash basis net worth method of reconstructing petitioner's *87 income, the method which respondent used at trial. The seminal case in this area is Holland v. United States,348 U.S. 121 (1954), wherein the Supreme Court discussed at length use of the net worth method in proving a criminal fraud case. In response to a contention by the taxpayers that the net worth method could not be used because it was a method of accounting different from that utilized by them, the Court stated: The provision that the "net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer", refers to methods such as the cash receipts or the accrual method, which allocate income and expenses between years. United States v. American Can Co.,280 U.S. 412, 419, 50 S.Ct. 177, 179, 74 L.Ed. 518. The net worth technique, as used in this case, is not a method of accounting different from the one employed by defendants. It is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income. * * * [348 U.S. 131]
Thus, *88 because the net worth method is not a method of accounting, respondent is not precluded from using it regardless of the method by which the taxpayer otherwise keeps his inadequate books and records. Rather, the Supreme Court held, the net worth method is only a method of proof. In the case before us, petitioner utilized the cash method of accounting for purposes of filing his income tax returns. At trial, respondent utilized that same method for purposes of the net worth reconstruction. Petitioner asserts that because he had inventories of unfinished houses, a net worth reconstruction recognizing such inventories is mandatory in a civil tax deficiency case, citing Herberger v. Commissioner,195 F.2d 293 (9th Cir. 1952), cert. denied 344 U.S. 820 (1952), and Bennett v. Commissioner,30 T.C. 114 (1958). However, petitioner's reliance on those cases is misplaced. Herberger did not deal with a net worth reconstruction, but rather was a case where the Commissioner determined that the taxpayer should have been on the accrual basis and recomputed his income accordingly. In Bennett, where the taxpayer had inventories, this Court *89 allowed respondent to reconstruct the taxpayer's income using an accrual basis net worth statement even though the taxpayer utilized the cash basis method to file his returns. We stated, in response to petitioner's objection to the net worth statement prepared on the accrual basis, that: * * * the net worth method is not a system of accounting (see Holland v. United States * * *; Morris Lipsitz,21 T.C. 917, 931, affirmed 220 F.2d 871 (C.A. 4); Estate of George L. Cury,23 T.C. 305, 332-334), and, in any event, where, as here, inventories are a factor in determining net income, the use of an accrual system of accounting is mandatory. Herberger v. Commissioner, * * *; Blaine Johnson,25 T.C. 123, 130 affirmed 233 F.2d 952, 956 (C.A. 4); Treasury Regs. 111, sec. 29.41-2. [30 T.C. 121.]
We did not say that an accrual basis net worth statement is the only means of proof where the taxpayer has inventories. Rather our response to the taxpayer's contention was that since the net worth method is not a method of accounting, restrictions on methods of accounting do not restrict *90 the means of preparing the net worth reconstruction. See Bond v. Commissioner,232 F.2d 822 (4th Cir. 1956), cert. denied 352 U.S. 878 (1956); Vassallo v. Commissioner,23 T.C. 656 (1955). We went on to add that, in any event, even if we were restricted in the method of preparing the net worth reconstruction, when inventories are a material income producing factor, use of the accrual method of accounting is mandatory and petitioner cannot complain about a net worth reconstruction prepared on that basis. In this case, we approve respondent's net worth reconstruction notwithstanding the fact that he ignored alleged inventories in making the reconstruction. A similar objection was made in Vassallo,supra.In that case, the taxpayer, who filed his returns on a cash basis, claimed respondent could not use a cash basis net worth reconstruction where he had inventories. In response to that objection this Court stated: The comparative net worth method of determining income and the sources and expenditures method, used by respondent in determining Vassallo's income, are not systems of accounting. Holland v. United States,348 U.S. 121 (1954); *91 Thomas A Talley,20 T.C. 715 (1953). Those methods are resorted to, as they were here, only because a taxpayer's books and records do not disclose his true income, nor is it possible to determine from such books and records what that income was. While we agree with petitioners that the respondent's reconstruction of Vassallo's income by such methods would have been more exact had its actual inventories been included, the respondent, under the authority granted him in section 41 [section 446b] of the Code, determined such income on the cash basis--the method which, in his opinion, most clearly reflected it. It was incumbent on the petitioners to show the amount of the inventories which they argue, if used, would more correctly reflect income. They made no showing and we, therefore, approve the respondent's determination. [23 T.C. 661-662.]
In Bond, the Court of Appeals for the Fourth Circuit, in affirming this Court, stated at page 826: We think this result [not requiring respondent to take into account inventories] is neither clearly erroneous nor arbitrary, when it is considered that taxpayer admittedly kept no inventory records; *92 that he was unable to prove the inventory figures which he claimed; and that, in the light of this and taxpayer's exaggerations as to other items, the Commissioner concluded that at best, these figures were haphazard guesses. Taxpayer has admitted that uniform elimination of inventories throughout the net worth computation, if relatively constant, had no appreciable effect on the computation. It is apparent that taxpayer has not proved that such inventories, if they existed, were not relatively constant. The Tax Court's conclusion must be sustained. In the case now before us, as in Vassallo, respondent's method of reconstruction would have been more precise had actual inventories and payables been proven and included. But nowhere in the record is there any evidence as to what these actual inventories and payables were. Petitioner did not introduce any evidence as to the value of either his inventories or his payables as of any given year end. In his reply brief, he claims that those figures set forth as inventory by respondent in support of the notice of deficiency and again in the answer must be taken as proven. In the notice of deficiency, respondent estimated the *93 amount of inventory which petitioner had as of the end of each year in his net worth computation, using as a basis those sales which occurred early in the following year. He then assumed trade payables in a like amount. At trial he utilized a cash basis net worth statement, ignoring the inventory and payables. That change alone had no effect on the amount of income as redetermined because it eliminated the same amount from the asset side as it eliminated from the liability side of the net worth statement. As a result we cannot find that the use of an accrual basis net worth statement utilizing the information in the record would more clearly reflect income than the method which respondent used at trial. [2] We cannot find respondent's proof erroneous or arbitrary simply because he made a change in his method of proof having no net effect. Petitioner next contends that respondent *94 raised a new matter at trial when he utilized a cash basis net worth statement (which did not include inventory or payables) as opposed to the accrual net worth statement (which recognized inventory and payables) respondent used to support the notice of deficiency. He asserts, therefore, that the burden of proof as to the alleged understatements of income is upon respondent. Rule 142(a). We disagree. A new matter is suggested where the evidence required to meet the position taken by respondent at trial differs from that which would be required to disprove his original determination. Estate of Falese v. Commissioner,58 T.C. 895, 899 (1972); McCormick v. Commissioner,38 B.T.A. 308 (1938). Such is not the case here. The net worth reconstruction made on the cash basis does not raise a new matter, but is merely a method of proving the amount of deficiency. Respondent's position at trial was neither inconsistent nor was new evidence required such as to shift the burden of persuasion to respondent. Petitioner also assails particular items in the net worth reconstruction itself.He asserts that inclusion of both the value of his residence at *95 North 4517 Center Road and the proceeds of the construction loan used in its construction as assets in the net worth computation creates a doubling of assets where the only liability which is reflected in the schedule with respect to those assets is a mortgage on the residence. More specifically, he alleges that there were outstanding payables as of December 31, 1968, with respect to the construction of the residence which should have been reflected in respondent's schedule. If the record in this case supported it, we would agree with petitioner that payables associated with that asset should have been included if it was petitioner's practice to purchase materials on credit from his suppliers. We would also agree that the construction loan proceeds should be "related" in the net worth computation to payables, if any, generated with respect to the property on which the construction loan was taken out. This situation is the converse of the inventory-payables question discussed above, in which both the inventory and the related payables were excluded from the net worth schedules; here, if the house is included in petitioner's assets, payables related there-to should likewise be recognized. *96 However, petitioner made no effort at trial to introduce evidence as to the existence of these "related" payables. In the absence of such evidence, we cannot make any finding as to the amount (or even the existence) of these payables or disregard the fact that petitioner received money from the construction loan to in some manner compensate for the fact that we gave petitioner no credit for those "related payables." The burden of proof lies with petitioner and we will not transform petitioner's failure to carry this burden to his advantage by disregarding the construction loan proceeds as an asset. The next point of assault on respondent's net worth computation is his alleged failure to include more nontaxable receipts (gifts) from his father-in-law, Joe Miller. While respondent did give credit to petitioner for having received one gift of $ 1,000 in 1967, petitioner claims that Miller gave petitioner most of the materials used in building his residence. At trial, petitioner and his father-in-law both claimed that gifts of the materials were made by Miller to petitioner. There was also testimony to the effect that Miller supplied the appliances for petitioner's residence. However, *97 when petitioner was questioned in 1970 concerning any gifts which he had received, he recalled only the $ 1,000 gift. We find it very difficult to believe that he would forget a gift as significant as the materials necessary to construct his own residence. There are two additional reasons we cannot accept petitioner's hypothesis concerning the gifts of materials and appliances. First, petitioner's alternative positions with respect to the source of financing North 4517 Center Road are contradictory and this weighs against his credibility. Petitioner argues that he had outstanding payables with respect to the residence while also arguing that Joe Miller, through his gifts of materials, gave petitioner most of the residence. Also there is a lack of specific proof. There is no evidence in the record to corroborate the testimony of the two interested participants. Nor is there any evidence as to amount. Apparently petitioner's position is that we should eliminate from the net worth computation his personal residence because we should find that either: (1) payables are outstanding sufficient to offset its value; or (2) it was substantially a gift. We cannot make such an adjustment, *98 absent more specific proof on the part of petitioner. Petitioner next contends that the value of the motel shown on the net worth statement is incorrect. Petitioner received the motel in exchange for a house and the assumption of a mortgage in the amount of $ 28,000. On the closing statement the house was assigned a value of $ 30,000. Thus, the motel appears on the net worth statement as having a value of $ 58,000. Petitioner asserts the value of the house was only $ 20,000, and, therefore, the motel was worth only $ 48,000. He offers as proof of this lower value testimony by one of respondent's agents to the effect that the recipient of the house refused to sign an affidavit reciting the value of the house to have been $ 30,000. Thus, petitioner would have us use this as evidence not only to impeach the value of the house as shown on the closing statement but also to establish its true value. We have two problems with petitioner's position. First, the recipient, who was not shown to have been an expert, was not clear on what the correct value of the house should have been; the revenue agent's testimony as to what the recipient said was confusing at best. Second, and *99 again the problem with much of petitioner's proof, is lack of specifics on his part. He may offer impeaching evidence as to the value assigned by the closing statement, which he signed, but he must do more. He must present concrete evidence as to an alternative value which we might use. This he has not done. Cf. Ullman v. Commissioner,264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957). [3]
Next, petitioner attacks respondent's net worth computation *100 because it does not account for petitioner's inventory or his payables as of year end. He asserts that he should be given credit on December 31 for houses in process, those houses being evidenced by sales made soon after year end. He also again claims that respondent's net worth computation is inaccurate because it ignores payables which he claims existed at each year end. We have previously dealt with these contentions in discussing petitioner's basic attack on respondent's entire net worth computation because it was on the cash and not the accrual basis. What we previously said is equally applicable here. Petitioner attacks the net worth statement as not reflecting substantial nontaxable gifts from Joe Miller relating to all the houses he constructed in 1967, 1968 and 1969. He alleges that these gifts were of both materials and appliances. We have addressed such a contention with respect to the taxpayer's own residence. He enlarges his assertion here and contends that Miller gave assistance in terms of materials and appliances for the other houses petitioner was constructing. The amount of the gift of materials is alleged to be the value of petitioner's residence at North *101 4517 Center Road plus "nontaxable receipts" (apparently labor, materials and appliances for the other houses) for other gifts given by Joe Miller. No value is placed on the amount of the appliances. Once again we have no evidence of specific values. To say that the value of the materials given equals the value of the residence plus other gifts cannot be given weight. Nor does the assertion that petitioner is entitled to an adjustment for nontaxable receipts with respect to the value of the appliances placed in homes constructed during the years in issue. Certainly, if such gifts had been made, the petitioner could have introduced evidence other than his own self-serving testimony and that of his father-in-law. In addition, in order to accept petitioner's position, we would need some proof of value. No documentary evidence was introduced by petitioner; rather this position was founded mainly on the testimony of two interested witnesses with no documentation or corroborative testimony. The argument made by petitioner which troubles us most is his net profit percentage analysis of respondent's reconstructed adjusted gross income figures. Petitioner contends that the adjusted *102 gross income as determined by respondent results in net profit percentages in excess of 20 percent for 1967, 1968 and 1969. This is to be contrasted with a local profit margin of approximately 5 percent for those years and petitioner's net profit percentage of 12 percent for the years 1970 through 1975. Standing alone, these figures make it appear the results of respondent's net worth reconstruction may be somewhat out of line. However, petitioner's net profit percentage analysis is not as persuasive as might appear on its face. First, we will not tamper with respondent's net worth computation when it is largely stipulated to by the parties unless we can discern errors of inclusion or omission. Second, respondent's adjusted gross income figures do include some Schedule D (sales of capital assets) items which are not reflected in the business sales figures. Finally, and most important, a portion of the adjusted gross income as determined by respondent reflects the value of services rendered by petitioner, to whom no salary was paid. In other words, in order to compare petitioner's net profit percentage (based on adjusted gross income as determined by respondent) with average *103 net profit percentage figures for the home construction industry, allowance must be made for the value of petitioner's services as costs not accounted for in arriving at the adjusted gross income figures used to determine petitioner's net profit percentage figures. Because such an allowance was not made here, the two figures are not comparable. We believe that these factors suffice to explain what appears to be a high net profit percentage determined by respondent. [4]
In summary, we find that respondent's net worth reconstruction withstands petitioner's attacks, and we sustain his deficiency determinations. We are left with the fraud issue. Respondent has the burden of proof to show petitioner has been guilty of fraud with intent to evade tax. Section 7454(a). In order to sustain his burden, *104 he must show by clear and convincing evidence actual and intentional wrongdoing on the part of petitioner with intent to defraud. Green v. Commissioner,66 T.C. 538 (1976); Miller v. Commissioner,51 T.C. 915 (1969). The existence of fraud is a question of fact to be resolved upon consideration of the entire record before us. Gajewski v. Commissioner,67 T.C. 181 (1976). Care must be exercised in distinguishing between that conduct which is gross negligence and that conduct which rises to the level of fraud. Gross negligence in keeping records or filing returns is not the equivalent of fraud. Griffith v. Commissioner,11 B.T.A. 565 (1928). However, proof of fraud with respect to any portion of the deficiency justifies application of the fraud penalty to the entire underpayment for that year. Silverman v. Commissioner, an unpublished opinion (2d Cir. 1977), cert. denied 431 U.S. 938 (1977). Petitioner again objects to the use of the cash basis net worth method. However, we believe that respondent's use of this method is also appropriate with respect to the fraud issue. Petitioner's objections *105 concerning respondent's failure to consider inventories in application of that method are equally without merit here. In the case of United States v. Vardine,305 F.2d 60 (2d Cir. 1962), a criminal fraud case, a cash basis taxpayer objected to the fact the trial court had not allowed him to introduce evidence of payables which would reduce his net worth. The government had not taken payables into account in making its net worth computation. In response to that objection, the Second Circuit stated: If a taxpayer disregards his accounts payable in reporting income on his annual tax return, i.e., reports as a cash basis taxpayer, then the government in computing his net worth in order to check the income reported on his tax return must also disregard these amounts. Whether this computation reflects net worth as accountants define it, i.e., the excess of the value of assets over liabilities, is irrelevant, United States v. O'Connor,273 F.2d 358, 361 (2d Cir. 1959), since the government is not seeking to determine the taxpayer's true worth but rather to verify the accuracy of his income tax return for a particular year. [305 F.2d 64.] *106 We believe the same can be said of inventories. That is, if the taxpayer disregards inventories in filing his returns, we cannot require the government to take those inventories into account, whether or not they may in fact exist, in a cash basis net worth reconstruction where the purpose is to verify the accuracy of a taxpayer's return for purposes of determining the existence of fraud on his part. We will now examine those indicia which respondent claims evidence petitioner's fraudulent intent to evade tax. Respondent first points to petitioner's reporting of his 1967 sales. On petitioner's Schedule C of Form 1040, he reported gross receipts of $ 80,900.He filed no Schedule D. In 1967 petitioner had sales of $ 76,640 which were properly reportable on Schedule C.In addition, he sold his duplex for $ 28,500, one-half of which was his personal residence, the other half being considered, of course, a capital asset. He also sold another parcel of property held for investment for $ 20,000. Both this sale and approximately one-half of the sale of the duplex should have been reported *107 on Schedule D. (The other half of the proceeds from the sale of the duplex was properly nonrecognizable under section 1034.) Petitioner contends that the net tax effect of the failure to report the Schedule D sales is roughly offset by his overstatement of Schedule C sales.He asserts that the parcel of property which he sold for $ 20,000 had a basis of $ 12,000. If Schedule D had been properly filed, it should have resulted in taxable income in the amount of approximately $ 4,000 from this sale (assuming the 50 percent deduction for long-term capital gains). This amount when added to the $ 76,640 of business sales, approximately equals the $ 80,900 actually reported on Schedule C. As for his failure to report the portion of the proceeds for that part of the duplex in which he did not reside, he explained that he believed the entire gain was exempt from recognition under section 1034. As to 1967, we believe petitioner's understatement of income was not shown by clear and convincing evidence to have been due to fraud. Although the amount of understatement was not insignificant, we find respondent has not met his burden to show that petitioner's underreporting was the result *108 of a fraudulent intent to evade tax. Respondent was unable, with respect to 1967, to isolate transactions which clearly and convincingly evidence fraud. In 1968, petitioner reported gross receipts of $ 120,400 on his Schedule C, again filing no Schedule D. From the schedule of sales, it appears that petitioner failed to report one of the six sales (University Road) made in 1968 and, in addition, underreported the sale of his personal residence at West 109 Westview by $ 6,000. (The record is not clear as to when the Westview house was sold. The closing statement is dated January 10, 1969, but petitioner reported the sale as having been made in 1968 and for purposes of the fraud issue we will treat the sale as having been made in the year when reported, 1968). Also, in 1968, petitioner traded the house which he had constructed at 8310 E. Maringo to the Eachos, the Eachos assuming a deed of trust and trading to petitioner a house located at North 5216 Stevens. On the 1968 return, petitioner claimed as a deduction for "closing costs" the net amount paid to the Eachos of $ 7,055.90, even though this clearly represented a portion of the acquisition cost of the property acquired *109 in the trade. On brief, petitioner asserts "it is more likely that petitioner inadvertently included the $ 7,055.90 as an expense simply because it showed due from sellers and he paid it." Petitioner also deducted a driver's license fee, a traffic fine and the cost of horseshoeing in 1968. There can be no doubt of the nonbusiness character of these items. Finally, we have found that petitioner deducted the costs of constructing his personal residence at North 4517 Center Road in 1968 and 1969. We believe the record fully warrants imposition of the fraud penalty in 1968. The instances which actually evidence a fraudulent intent, and which we found lacking in 1967, cannot be explained away in 1968. In 1968, petitioner deducted, as purported closing costs, $ 7,055.90 which was clearly part of the acquisition cost of the house acquired in the exchange. He deducted costs relating to the construction of his personal residence. He also deducted the cost of several items clearly nonbusiness in character. For the purpose of proving fraud, an understatement of taxes can result from an overstatement of deductions. Temple v. Commissioner,67 T.C. 143, 161 (1976). *110 When these excessive deductions are coupled with the omission of one of the six house sales made in 1968, we find that petitioner was guilty of fraud for that year. In 1969, petitioner failed to report two of the sales he made, the sales of the houses located at North 4510 and North 4522 Center Road. For the sale of North 4510 in the amount of $ 30,500, the petitioner offers no explanation; for the sale of North 4522 in the amount of $ 30,000, petitioner alleges that he believed he did not have to report that sale because he received a motel in trade for the house. At any rate, the net result in 1969 was that petitioner should have reported gross receipts of $ 215,300 and yet only reported gross receipts of $ 153,105.46. [5]
Additionally, *111 with respect to 1969, we found that petitioner deducted some portion of the cost of his personal residence. Therefore, in 1969, as in 1968, there are sufficient indicia of intent to support a finding of fraud. There are three additional factors which support our finding of fraud for both 1968 and 1969. First, was petitioner's everchanging characterization of payments made to his brother during the years in issue. We believe that petitioner's inconsistent and varied explanations with respect to these payments at the very least indicates a lack of concern for truthfulness and when added to the other factors referred to, is supportive of our conclusion of fraudulent intent. Similarly persuasive are the financial statements which petitioner filed in order to obtain loans during the years in issue. Those financial statements not only support the deficiency as determined by respondent by corroborating the accuracy of his net worth statements, but also support our finding of fraud because they indicate a knowledge on petitioner's part as to the amount of income he was actually earning. Romm v. Commissioner,245 F.2d 730 (4th Cir. 1957), cert. denied 355 U.S. 862 (1957); *112 cf. Imburgia v. Commissioner,22 T.C. 1002 (1954). Finally, we note that a consistent pattern of substantial understatements of gross income is indicative of fraudulent intent to evade taxes expecially when coupled with evidence of specific items of unreported income. Camien v. Commissioner,420 F.2d 283 (8th Cir. 1970), affg. a Memorandum Opinion of this Court. When these three factors are coupled with the specific instances of underreported income for each of 1968 and 1969, the cumulative effect of the evidence is too great to hold other than respondent proved fraud by clear and convincing evidence for each of those years. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue.↩
2. It might be a different matter if petitioner had introduced evidence as to the existence and amount of those items necessary to an accrual basis net worth statement. However, if respondent had that information he might have continued to rely on a net worth statement prepared on the accrual method.↩
3. Although not discernible from the record, it would appear that the recipient of the house would be inclined to affix as low a value as possible on the residence so as to reduce any gain he might have on the motel. While we have no idea as to how he reported the transaction for tax purposes, certainly his own desire to minimize any gain would make his position as to the house's value less than objective. Another problem which we have with the credibility of petitioner's position is that he paid an excise tax to the State of Washington upon the transfer of the house. This tax was based on a $ 30,000 value. Petitioner does not strike the Court as one who would voluntarily overpay his taxes.↩
4. Petitioner also argues that respondent has failed to establish any likely sources of income to support the alleged increases in net worth. However, respondent does not claim there are any sources of income other than that which petitioner reported from his sales of real estate.Rather, respondent asserts the unreported income arises from unreported sales and improper deductions.↩
5. Petitioner argues that the house sold at North 5216 Stevens which he received in exchange for his personal residence was not a business sale but was improperly reported as such, creating an overstatement of gross income.Although received in exchange for his personal residence, it is clear that he was holding that house for sale in the ordinary course of his business. As such, its disposition was a business sale. Section 1221(1).↩